Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

KENDRICK WEATHERSPOON,
        *Defendant-Appellant.*

No. 03-10551

D.C. No.
CR-S-03-0076-
DWH (LRL)

ORDER
WITHDRAWING
OPINION AND
OPINION

Appeal from the United States District Court
for the District of Nevada
David W. Hagen, District Judge, Presiding

Argued and Submitted
October 8, 2004—San Francisco, California

Filed June 13, 2005

Before: Stephen S. Trott and M. Margaret McKeown,
Circuit Judges, and Milton I. Shadur, Senior District Judge.*

Opinion by Judge Shadur;
Partial Concurrence and Partial Dissent by Judge Trott

---

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

## COUNSEL

Jason F. Carr, Assistant Federal Public Defender, Las Vegas, Nevada, for the appellant.

Darin La Hood, Assistant United States Attorney, Las Vegas, Nevada, for the appellee.

## ORDER

We have received a motion by the United States Attorney for the District of Nevada seeking modification of the written opinions in this case (both the majority opinion and the partial-concurrence-partial-dissent). For the reasons stated here, the motion is granted in part.

As for the majority opinion, the one modification that the motion seeks is its elimination of the word "recidivist" from this sentence:

> To label such recidivist conduct as "unremarkable" is itself remarkable.

Because the motion mistakenly characterizes that usage as "inartful," something should be said to dispel that notion. *Webster's Third New International Dictionary* lists this as the primary definition and example of "recidivist" (true to the term's medieval Latin and French etymology), before giving a secondary definition referring to criminal repeat offenders:

> one who relapses or has suffered a relapse (some of the patients admitted are new cases, others are recidivists)

That mirrors the dictionary's primary definition and example of "recidivism":

> a tendency to relapse into a previous condition or mode of behavior (a study of recidivism in mental patients)

In the context and place where "such recidivist conduct" appears in the opinion, then, the term's usage clearly conforms to that first-listed common meaning.

Nonetheless we recognize the United States Attorney's sensitivity to the fact that the term's usage most familiar to lawyers is in connection with criminal repeat offenders, a connotation that was certainly not intended by the opinion. Accordingly we have substituted the phrase "such repeat-offender conduct" for "such recidivist conduct."

As for the motion's expressed concerns regarding the partial-concurrence-partial-dissent, that opinion has been revised to delete any references to the name of the Assistant United States Attorney who handled the case, as well as making certain other changes. Hence the original opinion is ordered withdrawn, and a new opinion has been substituted in its place.

## OPINION

SHADUR, Senior District Judge:

Kendrick Weatherspoon ("Weatherspoon") appeals his conviction on one count of felon-in-possession of a firearm. Because we find that prosecutorial misconduct during the closing arguments affected the jury's fair consideration of the evidence in the record, we reverse and remand for a new trial.

### Factual and Procedural Background

At approximately 3 a.m. on August 22, 2002, Officer Shanan Kelly ("Kelly") of the Las Vegas Metropolitan Police Department stopped a vehicle that had failed to use its turn signal. Inside were three individuals: Vaneshia Taylor ("Taylor") in the driver's seat, Weatherspoon in the front passenger seat and Donald Ray Harris ("Harris") in the seat directly behind Weatherspoon. When a records check indicated that Weatherspoon had outstanding warrants, Kelly called in Officer Ray Kent ("Kent") as backup and Weatherspoon was arrested. Taylor consented to a vehicle search that led to the discovery of a loaded semiautomatic handgun under the front passenger seat. Weatherspoon was then charged as a convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Neither officer had actually seen Weatherspoon in possession of the gun, and the forensic evidence was inconclusive. So the arrest was based instead on circumstantial evidence and on the contents of handwritten statements provided to police at the time of the arrest by Taylor and Harris. Taylor had then said that she saw Weatherspoon drop a black gun to the floor of the vehicle and slide it under the seat immediately after the car was pulled over, while Harris asserted that he had

seen Weatherspoon earlier in the evening with a black gun tucked into his waist.[1]

But the government's case at trial was not as straightforward as those two statements might suggest. After the arrest Taylor fully recanted her statement and explained that she initially provided it (1) because the officers had threatened that she would herself be charged with offenses if she did not implicate Weatherspoon and (2) because she feared that any such charges would lead her to lose custody of her children. Although Harris never recanted the content of his statement, he did acknowledge at trial that he had provided it as a "stipulation" for not being arrested on outstanding warrants.

Because Weatherspoon's guilt depended on his possession of the firearm,[2] and because the officers did not directly observe Weatherspoon with the gun, the two-day trial centered around the accuracy of the statements provided by Taylor, Harris and the two officers on the scene. Defense counsel, arguing that the Taylor and Harris statements should not be credited by the jury because they were supplied in response to police pressure, focused instead on testimony by each of them—both before a grand jury and at trial—that was far more questionable in terms of ascribing possession of the gun to Weatherspoon. And the defense also challenged the credi-

---

[1]Harris' account of the events leading up to the arrest was the most hotly contested at trial. In addition to his statement to police, Harris told a grand jury that he saw Weatherspoon place a gun under the front seat. But at trial Harris hedged and stated instead that he could not see Weatherspoon clearly because he was seated directly behind him and that all he saw was a "motion like he was puttin' it away." And a federal public defender investigator testified that during an interview Harris said that he had never seen Weatherspoon with a gun on the day of the arrest. At trial Harris sought to explain that statement away by suggesting that it was attributable to confusion on his part as to the meaning of the word "day."

[2]Both of the other elements necessary for conviction on the charged offense—Weatherspoon's status as a convicted felon and the fact that the weapon had traveled in interstate commerce—were stipulated to at trial.

bility of Harris' testimony by suggesting that he had an incentive to implicate Weatherspoon: to avoid being arrested himself under state law.

For its part, the government relied on the testimony of Officers Kelly and Kent, in which they denied exerting improper influence over the submission of the Taylor and Harris statements, to argue that those statements constituted strong evidence of possession. And the prosecution also questioned the credibility of Taylor's claims of police pressure by raising the existence of a sexual relationship between Taylor and Weatherspoon.

Ultimately the jury returned a guilty verdict against Weatherspoon on the single count of felon-in-possession of a firearm. Weatherspoon urges that the verdict was impermissibly tainted by improper statements made by the prosecutor during closing arguments, and he now appeals.

## *Prosecutorial Misconduct*

Analysis of a claim of prosecutorial misconduct focuses on its asserted impropriety and substantial prejudicial effect (*see*, *e.g.*, *United States v. Yarbrough*, 852 F.2d 1522, 1539 (9th Cir. 1988)). We must therefore determine at the outset whether the prosecutor made improper statements during the course of the trial, after which we will turn to the effect of any such misconduct.

As to the threshold issue of impropriety, we conclude that prosecutorial misconduct was clearly involved, both (1) because the prosecutor vouched for the credibility of witnesses and (2) because he also made arguments designed to encourage the jury to convict in order to alleviate social problems. We address those issues seriatim.

[1] "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the

witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony" (*United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)). On that score Weatherspoon contends that the prosecutor vouched for the credibility of all of the major witnesses in his case: Kelly, Kent, Taylor and Harris.

At the very outset of his argument the prosecutor said this in discussing the testimony provided by the officers:

> We, first of all, heard from Officer Kelly, Metro officer; credible police officer.

That statement garnered an objection, and the district court instructed the prosecutor not to vouch. Undaunted, the prosecutor returned to the theme of police credibility in his rebuttal, telling the jury that the officers "had no reason to lie in this case or not tell the truth." After defense counsel's objection to that statement on vouching grounds was overruled, the prosecutor went even further:

> They had no reason to come in here and not tell you the truth. And they took the stand and they told you the truth. I guess, if you believe Mr. Valladeres [defense counsel], they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge; they lied to me; they lied to my agent, Agent Baltazar. I guess they lied to the dispatcher when they called it in. These are officers that risk losin' their jobs, risk losin' their pension, risk losin' their livelihood. And, on top of that if they come in here and lie, I guess they're riskin' bein' prosecuted for perjury. Doesn't make sense because they came in here and told you the truth, ladies and gentlemen.

**[2]** That statement was clearly improper. In *United States v. Combs*, 379 F.3d 564, 574-76 (9th Cir. 2004) we recently

considered similar statements made by a prosecutor during rebuttal and found that they constituted impermissible vouching because the prosecutor "plainly implied that she knew [an agent] would be fired for committing perjury and that she believed no reasonable agent in his shoes would take such a risk" (*id*. at 575). To be sure, the present situation is not quite as egregious as that in *Combs*, because the prosecutor there instructed the jury that they could be "darn sure he [the agent] would get fired for perjuring himself" (*id*. at 568), while no such firm assurance was provided here. But no such modest shade of difference in the level of impropriety calls for a different result, for the prosecutor here (like the prosecutor in *Combs*) clearly urged that the existence of legal and professional repercussions served to ensure the credibility of the officers' testimony. That suffices for the statement to be considered improper as vouching based upon matters outside the record (*see*, *e.g.*, *United States v. Boyd*, 54 F.3d 868, 871-72 (D.C. Cir. 1995), collecting cases from various circuits and cited with approval in *Combs*, 379 F.3d at 574-75).

[3] Next Weatherspoon directs us to prosecutorial vouching statements regarding Taylor and Harris that were made during closing arguments and went unchallenged:

> [Taylor's] statement about being threatened I don't believe is truthful, ladies and gentlemen.

> \*      \*      \*

> The point, ladies and gentlemen, is he told the truth in that handwritten statement that he gave on that morning, he told the truth when he came into the Grand Jury under oath, and he was in front of you today and told the truth to you.

It is true that "we have recognized that prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including

that one of the two sides is lying" (*Necoechea*, 986 F.2d at 1276). But even when grounded in an inference from the evidence, a prosecutorial statement may nevertheless be considered impermissible vouching if it "place[s] the prestige of the government behind the witness" by providing "personal assurances of a witness's veracity" (*United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980); *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his individual impressions of the evidence")).

Vouching of that sort is dangerous precisely because a jury "may be inclined to give weight to the prosecutor's opinion in assessing the credibility of witnesses, instead of making the independent judgment of credibility to which the defendant is entitled" (*United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985); *see also United States v. Young*, 470 U.S. 1, 18-19 (1985)). It is up to the jury—and not the prosecutor—to determine the credibility of a witness' testimony. All of the cited prosecutorial statements were improper because they skewed the jury's ability to make that determination.[3]

[4] At this point it is important to identify the mistaken premise on which our esteemed colleague's partial dissent in that regard rests. It points to a footnote sentence in the nearly half-century-old *Lawn v. United States*, 355 U.S. 339, 359

---

[3]In drawing the line between acceptable statements grounded on inferences from the evidence and unacceptable statements representing an improper suggestion of personal opinion, we have been especially sensitive to the form of prosecutorial statements — so that use of the prefatory phrase "I submit" has been preferred to the use of "I think," in part because the latter is more likely to lead the jury to give undue credit to the statement that follows (compare *Necoechea*, 986 F.2d at 1279 ("I submit to you") with *Kerr*, 981 F.2d at 1053 (9th Cir. 1992) ("I think")). Both statements here fall on the unacceptable side of the line, because there is nothing in their form to convey to the jury that the statements were intended only as a submission for its consideration and because they would therefore be reasonably understood by the jury as personal assurances.

n.15 (1958) for the proposition that a prosecutor's statement of personal opinion about a witness' credibility has only a single vice: It must not convey the impression that the prosecutor knows facts that the jury does not. Not so—as the partial dissent has acknowledged at its outset, over a quarter century later the Supreme Court in *Young*, 470 U.S. at 18-19 (emphasis added) identified not one but two reasons why prosecutors must not simply place their personal opinions as to witness credibility before the jury, and it is the second of those dangers that is presented in spades here:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; *and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.* See *Berger v. United States*, 295 U.S., at 88-89.[4]

In each instance the prosecutor's message is identical:

> I believe [do not believe] the testimony of Witness A. Therefore you should believe [not believe] Witness A too [either].

---

[4][Footnote by this Court] It should go without saying that the express recognition of the second of those evils in *Young*, which has been further recognized and applied since then not only in this Circuit's cases we have cited and quoted but also in a host of cases in other Circuits, cannot have been somehow trumped by the more limited one-sentence pronouncement in the *Lawn* footnote 27 years earlier.

It is of course the implicit "therefore" contained in that message that is improper. Neither our colleague nor anyone else has ever suggested a *legitimate* basis for a prosecutor's flat-out statement of his or her personal opinion as to witness credibility in a system that, like ours, vests the sole determination regarding such credibility (like all other factual determinations) with the jury. Nothing then flows from an extended discussion of cases that address the other "vouching" danger that was identified in *Young* (and *Lawn*).

[5] On that score, it is wholly beside the mark to suggest that a witness' challenge to the credibility of another witness during the trial somehow validates the prosecutor's repeated statements of his own belief as to such credibility in the course of closing argument, as though such statements were other than constitutionally prohibited vouching. Indeed, just the opposite is true: the existence of a dispute in the evidence as to the credibility of a witness—a matter that by definition is for the jury to resolve—makes the prosecutor's placement of his thumb on the scales all the more impermissible. For any prosecutor to state his own view that witnesses are credible or not credible, or indeed to say flat out—three times over in rapid succession—that a witness "told the truth," rather than to invite the jury to make all of those determinations based on evidence to which the prosecutor points, cannot fairly be labeled as "no more than a comment on the evidence that one would expect in a hard-fought case such as this," or as "nothing more than an unremarkable comment based upon the evidence," or as "merely a comment on the evidence."

In that respect we stress that the ethical bar is set higher for the prosecutor than for the criminal defense lawyer—a proposition that has been clear for at least seven decades (see *Berger v. United States*, 295 U.S. 78, 88 (1935); and see also such cases as *United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981) as well as the ABA Standards for Criminal Justice §3-5.8(b)). Although to be sure no lawyer, either public or private, should lay his or her own credibility on the line by

expressing his or her own opinion about a witness' believability, the difference is that a private lawyer's impropriety in that respect carries no implication of official governmental support. And in this particular instance, it is surely worth noting that the selfsame prosecutor has engaged in exactly the same kind of vouching conduct in two instances that has led other panels of this court to upset convictions obtained by that prosecutor (see the unpublished opinions in *United States v. Williams*, 2004 WL 2370557 (9th Cir. Oct. 21, 2004) and *United States v. Green*, 2004 WL 2984356 (9th Cir. Dec. 28, 2004)). To label such repeat-offender conduct as "unremarkable" is itself remarkable.

Weatherspoon also argues that the prosecutor impermissibly urged the jury to convict in order to alleviate societal problems. In his rebuttal, the prosecutor encouraged the jury on several occasions to feel comfortable entering a guilty verdict—for example:

> Convicting Mr. Weatherspoon is gonna make you comfortable knowing there's not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around semiautomatic. . . ."

At that point defense counsel objected, and the judge instructed the prosecutor to confine his arguments to "guilt or not guilt." Undeterred, the prosecutor continued by reiterating that "[y]ou can feel comfortable knowing there's a convicted felon that's been found guilty of possessing a loaded firearm, a fully loaded semiautomatic weapon."

Shortly thereafter the prosecutor returned to the same theme, telling the jury that "the law of being a felon in possession of a firearm, that protects a lot of people out there too." Again an objection followed, and the judge instructed the prosecutor to "just talk about guilt or nonguilt." And again the prosecutor failed to respond meaningfully to that directive, instead repeating his argument that "finding this man guilty is

gonna protect other individuals in this community." Another objection followed, but this time the judge overruled the objection and instructed defense counsel:

> When there is a serious objection, I will rule in your favor on it. At the moment, please let the Government complete its argument.

**[6]** That entire line of argument, made even more indefensible by its repetition in the face of directions to desist, was improper. We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury, as in *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994), quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984):

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

**[7]** It is true that the prosecutor did not engage in the even more egregious offense of "point[ing] to a particular crisis in our society and ask[ing] the jury to make a statement" (*United States v. Leon-Reyes*, 177 F.3d 816, 823 (9th Cir. 1999)). But the statements here nonetheless violated the *Koon*-identified principle. Weatherspoon's guilt at trial depended entirely on proof that he was in possession of a gun at the time that the car was pulled over. Those prosecutorial urgings—especially the later ones encouraging a conviction to protect other individuals in the community—spoke not to that question, but

rather to the potential social ramifications of the jury's reaching a guilty verdict.[5] They were clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact. As such, they were irrelevant and improper.

Despite all that has been said to this point, the prosecutor urges that his statements should be considered proper because he was simply making "invited replies" to arguments made by defense counsel during closing argument. Quite apart from the fact that some of the prosecutor's improper statements preceded that closing argument so that no "invitation" then existed, plus the added fact that the prosecutor never objected to any of the now-complained-of arguments by defense counsel, that attempted explanation wholly misunderstands the doctrine of "invited response" as applied in *Young*, 470 U.S. at 12. There the Supreme Court explained that in order to undertake a contextual review of prosecutorial misconduct, "the reviewing court must not only weigh the impact of the prosecutorial remarks, but must also take into account defense counsel's opening salvo" (*id*.).

[8] But that does not at all mean that whenever a defense counsel attacks the credibility of witnesses the prosecutor can respond with vouching statements. To the contrary, we have concluded that "[a]ttacks on the credibility of a defense witness are legitimate tools of advocacy and do not, standing

---

[5] And the statements were clearly designed to emphasize Weatherspoon's status as a "convicted felon." Although that status is obviously relevant to the case as an element of the offense charged, it was stipulated to the jury and so should not have been posed as an issue in the way that it was. Instead its use here was patently designed to persuade the jury to convict Weatherspoon more because he is a generally dangerous individual than because he violated a particular law in this instance. In that regard, see *Commonwealth of N. Mariana Islands v. Mendiola*, 976 F.3d 475, 487 (9th Cir. 1993):

> While commentary on a defendant's future dangerousness may be proper in the context of sentencing, it is highly improper during the guilt phase of a trial.

alone, trigger the invited response rule" (*United States v. Smith*, 962 F.2d 923, 934 (9th Cir. 1992)). And that is particularly true when, as here, the defense attacks were grounded in inferences from the evidence rather than defense counsel's personal assurances.

**[9]** Moreover, even if any defense statements were somehow viewed as opening the door to a prosecutorial response, the particular response chosen here would still be inappropriate because "the prosecution is not allowed to use improper tactics even in response to similar tactics by the defense" (*United States v. Sarkisian*, 197 F.3d 966, 990 (9th Cir. 1999); *see also Smith*, 934 F.2d at 934). Prosecutors must understand the different—and special—place that they occupy in the criminal justice system (*see*, *e.g.*, *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) and cases cited there). Though we do not of course countenance, let alone encourage, excesses on the part of defense counsel, the prosecutor's role as representative of the United States (the named plaintiff in every federal criminal prosecution) demands the exercise of far better restraint and better judgment than was exhibited here. In short, nothing about the invited response doctrine rescues the prosecutor's statements from impropriety—even to the extent that some (though not all) of them might be viewed as invited, the statements did far more than simply "right the scale."

*Effect of the Prosecutorial Misconduct*

**[10]** Next we must determine whether the improper statements identified in the preceding section were so prejudicial to Weatherspoon's substantial rights that a new trial is required. As taught in such cases as *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994):

> Where defense counsel objects at trial to acts of alleged prosecutorial misconduct, we review for harmless error on defendant's appeal; absent such an

objection, we review under the more deferential plain error standard.

Weatherspoon raised objections at trial to some but not all of the statements that he now challenges as improper. Even so, he argues that a harmless error analysis should be applied to the entirety of his appeal because his failures to object were attributable to the district court's demonstrated unwillingness to entertain his objections. But we need not venture into that fray, because the misconduct at issue here requires reversal even under the more restrictive plain error standard, under which reversal is appropriate "only if the prosecutor's improper conduct so affected the jury's ability to consider the totality of the evidence fairly that it tainted the verdict and deprived [Weatherspoon] of a fair trial" (*Smith*, 962 F.2d at 935). And to that end we must review the potential for prejudicial effect in the context of the entire trial (*Young*, 470 U.S. at 16).

**[11]** "To determine whether the prosecutor's misconduct affected the jury's verdict, we look first to the substance of a curative instruction" (*Kerr*, 981 F.2d at 1053). In that respect, even in the absence of objections by defense counsel, a "trial judge should be alert to deviations from proper argument and take prompt corrective action as appropriate" (*id.* at 1054).

**[12]** In this instance the trial was doubly flawed: Objections were indeed made by defense counsel, and whatever curative statements were provided by the district judge were inadequate. As for the objections, some were overruled, those that were sustained did not produce any meaningful alteration of the prosecutor's arguments, and the manner in which such objections were sustained unfortunately did not deliver the required strong cautionary message (indeed, as quoted earlier, one response by the trial judge actually chilled further objections). Such failures to correct the improper statements at the time they were made cannot be salvaged by the later generalized jury instruction reminding jurors that a lawyer's state-

ments during closing argument do not constitute evidence (*United States v. Simtob*, 901 F.2d 799, 806 (9th Cir. 1990)). In short, the curative instructions offered here did not neutralize the harm of the improper statements because "[t]hey did not mention the specific statements of the prosecutor and were not given immediately after the damage was done" (*Kerr*, 981 F.2d at 1054).

[13] Another important factor contributing to the prejudicial effect of improper statements is the strength of the case against a defendant. When the case is particularly strong, the likelihood that prosecutorial misconduct will affect the defendant's substantial rights is lessened because the jury's deliberations are less apt to be influenced. But as the case becomes progressively weaker, the possibility of prejudicial effect grows correspondingly. Moreover, the possibility of prejudicial effect stemming from vouching is increased in cases where credibility is of particular importance (*Necoechea*, 986 F.2d at 1276).

[14] Despite the trial prosecutor's contentions to the contrary in the government's brief and again in oral argument, the case against Weatherspoon was not particularly strong and depended in large measure on witness credibility. Hence the already-described instances of prosecutorial misconduct—and especially of vouching—present a strong possibility of prejudicial effect. In this respect the case is again similar to *Kerr*, 981 F.2d at 1054, where we reversed for plain error because the case was close and because "the testimony of the . . . 'vouched' witnesses was crucial to the government's case and the prosecutor's argument."

## *Conclusion*

[15] This was a comparatively close case that boiled down to a battle over credibility. In that context, prosecutorial statements that vouch for the credibility of witnesses and that encourage the jury to act based on considerations other than

the particularized facts of the case pose a real danger to the defendant's right to a fair trial. Because that danger was not effectively mitigated by curative instructions from the district judge, we conclude that the prosecutorial misconduct here "affected the jury's ability to consider the totality of the evidence fairly" (*Smith*, 962 F.2d at 935). We therefore REVERSE for plain error and REMAND for a new trial.

---

TROTT, Circuit Judge; Concurring in part and Dissenting in part:

## I

Prosecutorial misconduct in the context of closing argument is entirely a creation of our "common law." In examining these issues, we do not begin either with the plain language of any statute, or with a specific provision of the Constitution or the Bill of Rights. Instead, our warrant arises from the defendant's broad right to a "fair trial" guaranteed by the Due Process Clause. As one might surmise, however, "[t]he line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *United States v. Young*, 470 U.S. 1, 7 (1985); *Donnelly v. De Christoforo*, 416 U.S. 637, 645 (1974) (the constitutional line drawing in this area is "necessarily imprecise"). Nevertheless, case law has identified concrete dangers to a defendant's right to a fair trial posed by a prosecutor's arguments that transgress the boundaries of propriety.

The first danger relevant to this appeal arises from comments by a prosecutor that might convey to the jurors "the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant." *Young*, 470 U.S. at 18. Such comments are improper because they "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.*, *see also*

*United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).

The second danger stems from comments by a prosecutor that invite the jury "to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19, *see also Necoechea*, 986 F.2d at 1276. Were a jury to take this approach, the jury would abdicate its important role in the process and become merely a rubber stamp of approval rather than an independent body putting the government to its constitutional test.

Because of these hazards to a fair trial, case law has condemned both (1) personal vouching by a prosecutor for the credibility of the government's witnesses, and (2) the expression by a prosecutor of the prosecutor's personal opinion as to the guilt of the accused, but only when remarks either "say [or] insinuate that the statement was based on personal knowledge or on anything other than the testimony of those witnesses given before the jury." *Lawn v. United States*, 355 U.S. 339, 359 n.15 (1958). To quote the old Fifth Circuit, "The test as to whether the prosecutor has expressed an improper opinion is 'whether the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor' relied." *United States v. Prince*, 515 F.2d 564, 566 (5th Cir. 1975). Both practices tend to override the important role of jurors in our system by drawing them away from their sworn duty to focus only on the evidence in the record and the law.

A third danger arises from a prosecutor's argument that might arouse a jury's passions and prejudices against a defendant and cause jurors to decide the case on the basis of extraneous considerations. The vice of such an argument is that again, it tends to divert a jury from its sworn duty to decide the case on the evidence and the law, and to focus instead on issues "broader than the guilt or innocence of the accused

under the controlling law." ABA STANDARDS FOR CRIM. JUS-
TICE, 3-5.8(d) (2d ed. 1980); *see also* MODEL RULES OF PROF'L
CONDUCT R. 3.4(e); CODE OF PROF'L RESPONSIBILITY DR 7-
106(C)(7); ABA STANDARDS FOR CRIM. JUSTICE, 3-6.1(c); *Dar-
den v. Wainwright*, 477 U.S. 168, 191-92 (1986).

Examples of arguments we have held to be improper
because they create the vouching hazard to a fair trial illus-
trate our due process concerns. In *United States v. Smith*, 962
F.2d 923 (9th Cir. 1992), we reversed a conviction where a
prosecutor personally vouched for the credibility of a key
government witness and literally guaranteed that he and the
government would never bring charges that were not true. The
prosecutor stated:

> [Getting a conviction] isn't a prosecutor's job. A
> prosecutor's job is to guarantee that every criminal
> defendant receives a fair trial. That's my job. A pros-
> ecutor's job is to turn over every piece of evidence
> to the defense if it would assist them. That's the
> prosecutor's job.
>
> . . . How many times did you see me during the
> course of trial give exhibits to the defense so that
> they can mark them? Or see me stipulate to the
> admission of exhibits for the defense? My job is to
> assure these individuals a fair trial, not to convict
> them.
>
> . . . .
>
> . . . Mr. Waterman implies that George Brown got
> up here and said whatever he wanted to say and that
> the prosecution wouldn't prosecute him for perjury,
> not if he brought him a conviction. Well, that's
> absurd. My job is to guarantee a fair trial. If any wit-
> ness commits perjury on the stand it's my job to seek
> an indictment against him if I can prove it.

. . . .

> Truth isn't something to be abused like that. Truth is as it is. And the government's job is to find the truth, to ferret through all this confusion, to ferret through all the smoke screens and lead you to the truth. [My grandmother] asked me, "What do you do in a trial?" "Present evidence." "And then what happens?" "Well then I sit down and everyone says bad things about me." . . . But if I did anything wrong in this trial, I wouldn't be here. The court wouldn't allow that to happen.

*Id.* at 927-28 (alternations in original).

In reversing and remanding for a new trial, we said,

> The prosecutor in this case not only placed the prestige of the law enforcement branch of government behind his conduct of the trial and behind Brown's testimony, he also engaged in an additional and separate form of vouching that is qualitatively different than the statements involved in *Young* and *Flake*. In addition to invoking the integrity of the government, he invoked the integrity of the court. He stated: "But if I did anything wrong in this trial, I wouldn't be here. The court wouldn't allow that to happen." This final remark cannot be classified as simply an arguably invited comment on the prosecutor's special role. Rather, unlike the other comments that courts have on some occasions reluctantly overlooked, it placed the imprimatur of the judicial system itself on Brown's credibility. That is something we simply cannot permit.

*Id.* at 936.

On the other hand, in *United States v. Flake*, 746 F.2d 535 (9th Cir. 1984), *overruled on other grounds by United States*

*v. Uchimura*, 107 F.3d 1321 (9th Cir. 1997), to which *Smith* refers, we did not find reversible error where the prosecutor said the following in response to defense claims of government dishonesty:

> Now, in the face of the evidence, the argument has been made to you that you cannot believe that, you just can't believe that, just — just using your common sense, you can't believe that. If you accept that argument, then you have to accept two other things. First of all, in spite of Mr. Church's testimony, you have to believe that because the questions asked of him on redirect examination were precise and direct and all-encompassing, you have to believe that Mr. Church perjured himself intentionally and wilfully on the stand. And more than that, you have to believe the Government of the United States, in the person of the prosecutor standing before you, the agents who have been at the table and the people of the United States Attorney's office have suborned that perjury, that they have allowed that witness to testify in that perjurious way, they have elicited that perjury from him intentionally to deceive you and mislead you.

> In order to accept the argument made to you by the defense, you have to accept that, as well.

> I suggest to you, ladies and gentlemen, that there is no evidence, no evidence before you — and that is the basis on which you should make your decision — no evidence that there has been any deal made of any kind in connection with Mr. Church's testimony.

746 F.2d at 540. When we examined that argument in context, we did not find error because these comments were "clearly invited" by the defense and did no more than summarize the defense's allegations. Under these circumstances, we did not

regard that argument as placing the prestige of the government behind the case or the witnesses.

*Flake* thus illustrates the rule that *all* challenged arguments by a prosecutor must be evaluated in the context of the entire trial, not just in isolation against an abstract standard. Moreover, each case is different, and each case must be assayed on the basis of its unique facts and circumstances. We take our lead in this regard from the Supreme Court's decision in *Young*:

> Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant. Indeed most Courts of Appeals, applying these holdings, have refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray.

> In retrospect, perhaps the idea of "invited response" has evolved in a way not contemplated. *Lawn* and the earlier cases cited above should not be read as suggesting judicial approval or — encouragement — of response-in-kind that inevitably exacerbate the tensions inherent in the adversary process. As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments,

but *whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.*

> In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing a conviction.

*Young*, 470 U.S. at 13 (citations omitted) (emphasis added).

Finally, "[a]ssuming the prosecutor's remarks exceed permissible bounds and defense counsel raised a timely objection, a reviewing court could reverse an otherwise proper conviction only after concluding that the error was not harmless." *Id.* at 13 n.10 (citing *United States v. Hasting*, 461 U.S. 499 (1983)). As the Court said in *Hasting*,

> The goals that are implicated by supervisory powers [including the goal of preserving judicial integrity by ensuring that a conviction rests on appropriate considerations solidly before the jury] are not, however, significant in the context of this case if, as the Court of Appeals plainly implied, the errors alleged are harmless. Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error. Further, in this context, the integrity of the process carries less weight, for it is the essence of the harmless-error doctrine that a judgment may stand only when there is no "reasonable possibility that the [practice] complained of might have contributed to the conviction."

Finally, deterrence is an inappropriate basis for reversal where, as here, the prosecutor's remark is at most an attenuated violation of *Griffin* and where means more narrowly tailored to deter objectionable prosecutorial conduct are available.

*Id.* at 506 (second alteration in original) (citation omitted).

Moreover, as Justice Frankfurter said in *Johnson v. United States*, 318 U.S. 189 (1943),

In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*Id.* at 202 (Frankfurter, J., concurring) (quoted with approval in *Young*, 470 U.S. at 16).

## II

I turn now to an evaluation of Weatherspoon's discrete allegations of prosecutorial misconduct.

### A.

The first instance of alleged impermissible vouching arose in the prosecutor's opening final argument when he discussed the testimony of Officer Kelly. About Kelly's testimony, the prosecutor said, "And I want to go through with you *the evidence* that we heard in this case. We, first of all, heard from Officer Kelly, Metro Officer; *credible police officer*." (emphasis added).

To this statement, Weatherspoon's counsel immediately objected, saying, "[y]our Honor, objection. Vouching, sir."

The court responded: "Yes. Don't vouch for the credibility of the witness," prompting the prosecutor to say, "I'll leave it to the members of the jury to decide what they thought of Officer Kelly."

I commend the district court for its prompt intervention and reminder to the prosecutor to avoid vouching, but in the cold light of day, whether what the prosecutor said, "Officer Kelly . . . credible police officer," is impermissible vouching, is certainly debatable. I do not think it is vouching.

In particular, Officer Kelly's credibility had been directly challenged by Weatherspoon's fianceé, Vaneshia Taylor, whose testimony as a hostile witness was in essence that Officer Kelly — or one of the officers — lied about his conversation with her when the gun was found in her car under Weatherspoon's seat, a conversation resulting in her written statement that implicated Weatherspoon as the possessor of the weapon. Her testimony suggested that Officer Kelly had lied under oath during the trial and committed perjury when he denied the behavior attributed to him by Weatherspoon's fianceé. Under these circumstances, it was certain that the prosecutor would discuss Officer Kelly's credibility in his summation, and that he would use a form of that word: credibility.

I note also that when the prosecutor recalled Officer Kelly to the stand on rebuttal to deny the inappropriate conduct attributed to him by Taylor, Weatherspoon's counsel attempted to get him to opine that Harris "is lying" about what he said about Officer Kelly's conduct. The court sustained an objection — properly so — to counsel's attempt to make one witness characterize the different testimony of another witness as a lie, but the points are (1) that accusations of falsehoods and lying were flying fast and furious in this trial, and (2) that Weatherspoon's attorney's tactic was to make Officer Kelly out to be a liar, in which case, Taylor could be regarded as truthful in her testimony but not in her

written statement. There is certainly nothing wrong with defense counsel trying to get at the truth by attempting to destroy the credibility of a witness, but when this tactic occurs, it is not out of line for the prosecutor to attempt to present in argument the witness as credible.

The Supreme Court's analysis and holding in *Lawn* supports my conclusion. In *Lawn*, in closing summation the prosecutor told the jury, "[w]e vouch for [government witnesses Roth and Lubben] because we think they are telling the truth." 355 U.S. 359-360 n.15. "Vouch"? "We think they are telling the truth"? At first blush and without carefully applying the reason behind the vouching rule, one might regard this statement as objectionable and improper. Not so, said the Supreme Court. Why? Because

> [t]he Government's attorney did not say nor insinuate that the statement was based on personal knowledge or on anything other than the testimony of those witnesses given before the jury. . . . Moreover petitioners' counsel in his summation to the jury had argued that the Government's case was a persecution of petitioners, had been instituted in bad faith at the instance of a group of revenue agent[s], and was supported 'solely' by the testimony of Roth and Lubben who were admitted perjurers.

*Id.*

Looking in context at what the prosecutor said here, I see none of the dangers lurking in the prosecutor's words that support the rule against vouching. The challenged comment (1) specifically references "the evidence that we heard in this case," (2) does not suggest or insinuate a reference to information not in the record, and (3) does not invite the jurors to rely on the integrity of the government. The use here of these two words — "credible witness" — comes nowhere close to the statements we have condemned in other cases.

In sum, in the face of defense accusations to the contrary, the prosecutor simply called Officer Kelly a credible witness. In context, I regard this — as did the Court in *Lawn* — as no more than a comment on the evidence that one would expect in a hard-fought case such as this. *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998), is on point: "In the present case the prosecutor did not suggest that he had special knowledge of facts not before the jury. He 'submit[ted]' that the witnesses were credible, not that he personally knew the facts, and then directed the jury's attention to the evidence supporting his contention." (alteration in original).

Furthermore, any vouching that occurred did not render the trial fundamentally unfair because, as is customary, the court here instructed the jurors — immediately before argument — that their duty was to decide the case "solely on the evidence" before them, which consisted of (1) the sworn testimony of any witness, (2) the exhibits received in evidence, and (3) any facts to which the attorneys had agreed or stipulated. More to the point, the jury was given these pertinent orders:

> In reaching your verdict you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

> 1.  Arguments and statements by lawyers are not evidence. *The lawyers are not witnesses. What they have said in their opening statements, will say in closing arguments and have said at other times is intended to help you interpret the evidence, but it is not evidence.* If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Jury Instruction No. 5 (emphasis added). "Such instructions dilute the potential prejudice arising from improper com-

ments." *United States v. Koon*, 34 F.3d 1416, 1445 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996); *see also Necoechea*, 986 F.2d at 1283 ("Likewise, the vouching that occurred during closing argument was effectively neutralized by the court's instruction that comments of counsel are not evidence.").

Finally, whatever possibility of error that might have existed was erased by the judge's prompt intervention I noted earlier with an admonition to the prosecutor in the juror's presence to the effect that vouching for the credibility of a witness was improper.

**Volume 2 of 2**

**B.**

Weatherspoon's second claim of vouching relates to the prosecutor's follow-on statement in the same argument, without objection, that the prosecutor did "not believe" to be truthful Vaneshia Taylor's testimony repudiating the substance of her earlier written statement that incriminated Weatherspoon, her boyfriend/fiancé. This assertion directly followed and was linked to the prosecutor's argument discussed in Part A., *supra*, that the alleged antagonist in this drama, Officer Kelly, was indeed credible. The proposition that follows from Officer Kelly being credible is that Taylor was not.

To understand and evaluate the prosecutor's "I do not believe" statement, it must be read in context, as required by *Lawn* and by *Young*. When so read, it becomes clear that his statement was nothing more than an unremarkable comment based upon the evidence regarding the credibility of a central witness's controversial testimony.

To begin with, Taylor, the driver of the car, wrote and signed a statement when pulled over by the police saying that Weatherspoon "dropped the weapon, a black gun, to the floor and slid it under the seat." In her appearance before the grand jury, she backed away from this statement and would concede only that the gun "could have" belonged to Weatherspoon. When called at the trial, she claimed her written statement incriminating Weatherspoon was a lie, and she asserted that she had falsely incriminated Weatherspoon out of fear because Officer Kelly had menaced her with prosecution for possession of the firearm, which raised in her mind the possible loss of custody of her children. Officer Kelly denied this account under oath.

Counsel for Weatherspoon made the point that Taylor's repudiation before the grand jury of her written statement was made under oath and under the penalty of perjury. The purpose of this point clearly was to bolster the believability of

her testimony in court by showing that it had first been made before the grand jury at the risk of perjury.

Here, then, is the prosecutor's entire disputed responsive argument regarding the believability of Vaneshia Taylor's testimony, her written statement, and her grand jury testimony:

THE PROSECUTOR:

You heard the testimony from Officer Kelly. They arrested the defendant. They have the vehicle searched. They found that weapon underneath the seat where this defendant, Mr. Weatherspoon, was seated.

We also heard evidence from Officer Kelly about the voluntary statements that he obtained in this case. As part of his investigation and the investigation of Officer Kent, they inquired from Ms. Taylor who possessed this weapon. And you have in evidence before you a statement of Ms. Taylor, her statement saying the defendant had this gun, in her own handwriting on that morning stating she saw him with this gun. In her own handwriting.

You also heard from Officer Kelly. There was no threats. There was no coercion. Never mentioned anything about her children or her not gettin' her children back. There was no evidence of that. You heard from Officer Kelly and Officer Kent on rebuttal when we just put them up here at the end. Again, no evidence of that. No evidence of threats or coercion or anything to do with threatening her regarding her children.

We next heard from Vaneshia Taylor in this case. We heard from her today. You heard from — from her and you heard about her handwritten statement

that you're gonna have before you when you go back to the jury room.

I find it a little ironic that she agrees with everything in the statement except for the most important part. Do you remember? She said: I agree. Everything in there's accurate except what I said about the gun. The police made me do it. The most important line in there where she says, "When pulled over the passenger, Ken, dropped the weapon, a black gun, to the floor and slid it under the seat." The most important part of this she says, oh, the officer made her write that. Everything else is accurate though.

He had a white T-shirt and blue shorts. That's accurate. And she left home at 3:00 a.m. That's accurate. That she went to her cousin's to pick him up so that he could work on the car in the morning, that's accurate. But it's a little ironic the most important part she says the officers made her do it. And, again, she doesn't remember which officer that was who made her put that in there. No — no evidence from the officers that subject of her children was even brought up. No evidence of that at all. She also testified this gun wasn't hers. We know it wasn't hers; she said it wasn't her mom's. Those are the only two people that had access to the car. That was her testimony.

You heard evidence from her that she supposedly was threatened by these officers regarding her children. It's the first time we heard it today by her own admission. She never went and told police on that night. She never went to the — she never came into the Grand Jury, under oath, and told anybody at the Grand Jury. She had that opportunity. Never did. Never mentioned it. Never mentioned it to anybody except for here today she now says that officer or

officers or whoever threatened her with that. *Her statement about being threatened I don't believe is truthful, ladies and gentlemen.*

You also heard this was her fiancé. Boyfriend at first; turned into a fiancé by the time she came to the Grand Jury. She comes into Grand Jury and says, oh, I lied at that time. This is the time she's been talkin' to him on the phone. They are engaged to get married.

(emphasis added).

In sum, and having in mind again (1) the court's pre-argument admonition that counsel's statements were not evidence but were intended only to help the jurors interpret the evidence, and (2) the court's statement during the prosecutor's argument that a prosecutor must not vouch for the credibility of a witness, I conclude that the prosecutor's statement was not vouching, it was not error, and it certainly was not plain error. Here, what we said in *United States v. Davis*, is not only relevant, but controlling: "[A] prosecutor may not state his personal belief in the guilt of a defendant (unless he asserts he is basing his belief on the strength of the evidence in the case)." 564 F.2d 840, 846 (9th Cir. 1977), *cert. denied*, 434 U.S. 1015 (1978). The prosecutor's statement that, "Her statement about being threatened I don't believe is truthful," was manifestly based on a review of the evidence as the prosecutor summarized it, and nothing else.

## C.

This sequence brings us to the testimony of Donald Harris, a back seat passenger in Taylor's car who, like Vaneshia Taylor, had been inconsistent in his story as to whom the gun belonged. Like Taylor, Harris wrote a statement on the day of the arrest saying that he had seen Weatherspoon with the gun. Counsel for Weatherspoon called an investigator to the stand,

Mr. Heddy, who testified that before the trial he had confronted Harris with his written statement incriminating Weatherspoon, and that Harris denied seeing Weatherspoon with the gun. Harris attempted in testimony to explain this discrepancy by saying that the investigator asked him only if he had seen Weatherspoon with the gun "that day," and that his "no" answer was truthful because he had not seen Weatherspoon with the gun "that day," only just before they got into the car.

Weatherspoon's counsel attacked Harris's grand jury testimony by trying to show that Harris committed perjury when he testified that he saw Weatherspoon place the gun under the seat.

This evidentiary background brings us to the prosecutor's argument now alleged to constitute vouching, but to which no objection was made during the trial:

THE PROSECUTOR:

You've — next I want to talk about Mr. Harris's testimony, that you heard from today. Bottom line is Mr. Harris isn't a felon. He can legally possess that fully loaded weapon. Under the law, he can possess that weapon. He can have that weapon at any time. *The point, ladies and gentlemen, is he told the truth in that handwritten statement that he gave on that morning, he told the truth when he came into the Grand Jury under oath, and he was in front of you today and told the truth to you.*

Was he the most articulate person? No. But he told you in his manner what happened. And it's consistent with what he said in that handwritten statement on that morning, to what he said at the Grand Jury on — when he was before the Grand Jury in February, and when he came in here and told you here today.

And you heard from — Investigator Heddy said he went out and talked to him; tried to make him out to be untruthful. Well, in all due respect, I think he confused him more than anything else. You heard from Mr. Harris. He was confused about what he was talkin' about. Did he mean during the day? Well, you heard, Mr. Heddy didn't ask him on that morning, at that time. Did not.

Now, let's remember what Mr. Harris said. From that stand there today under oath, he pointed to the defendant and said that's the person I saw with that gun when I got into the car on August 22nd, stickin' out of his waistband a black-handled gun on that morning. Uncontradicted statement. That's what he said. He said that in his statement, also, that I read to you. He said: "I seen the gun. As far as I know it was black. I don't know what kind it was. It was in his possession. His name is Kendrick Weatherspoon." His handwritten statement given on that early morning to police.

(emphasis added).

My conclusion with respect to this assignment of error is that the disputed comments were not vouching, but merely a comment on the evidence, which, after all, is the central purpose of argument. Even if we were to regard this as error, it certainly is not plain, and it did not affect Weatherspoon's substantial rights.

## D.

The next vouching objections lodged against the prosecutor occurred in rebuttal argument after Weatherspoon's counsel had finished his argument in which he lambasted Harris as a liar, and Taylor as a repentant liar who changed her tune once

she was under oath. To get the full flavor of defense counsel's argument, I reproduce the body of it at length:

MR. VALLADARES:

Now, allow me, please, to go ahead and go over the evidence as it was presented in this case. *Now, please remember that, again, what I'm saying right now is argument; what [the prosecutor] is saying is purely argument. You are the ones that heard the argument — the evidence and you are the ones that need to make the decision.*

But the bottom line is this: The arresting officers, Officers [sic] Kelly and Officer Kent, if there is one absolutely clear thing that we know out of this whole thing is that at no point did either of them see Mr. Weatherspoon with a gun. That didn't happen. At no point did they see Mr. Weatherspoon touching a gun. That didn't happen. That's uncontested. They told you that.

. . . .

Now, in this case the evidence is clear that Ms. Taylor and Mr. Harris had a reason to lie at the point in which they were stopped. The evidence is also clear that they — these are individuals that are pre-pared to lie. And, quite frankly, outta everything that they said on that stand, I suggest to you: Don't believe anything. Don't believe absolutely anything that they said.

Let me review that. Let's start with Ms. Taylor. Ms. Taylor has definitely — or has definitely some good reasons to go ahead and concoct a story on the early morning of August 22nd, 2002, when she was stopped by Officer Kelly. Ms. Taylor was a con-

victed felon. Ms. Taylor knew and told you that she knew she could not go ahead and possess a gun. She couldn't do that, she would be in violation of the law. And this gun is obviously in her car. The evidence is clear: This is a car that she was driving. This is her car. The car is in her name; it is in the name of her mother too.

Second, Ms. Taylor also told you that she had two kids; that one kid, because of whatever she did, was in state custody and that she wanted to get that kid bad, very badly. And that's understandable. It is the love of a mother. And the love of a mother concurs [sic] all. And we all know that. And the Government says, oh, she had a reason to lie now and in front of the Grand Jury because Mr. Weatherspoon was her boyfriend, her fiancé, at one point boyfriend/fiancé. She said that, I guess, that's not the case anymore. But I asked her point blank: You may have cared for Mr. Weatherspoon. But isn't it the truth that you will lie for your child and you will lie to get your child back? And she said point blank, "Yes, I would."

And let's go ahead and clarify this thing because the Government also is confusing the evidence and is confusing it in a way that's very important too. Because what she said is the following: She said that what they — the officers told her is that this is her car. If something is found in the car, she can be liable for it. And that makes sense. I mean, that's just logical. It doesn't take a lawyer to figure that out.

She didn't say that the officers told her that they would take her children away or that she would not be able to get her children back. That's not what she said. The Government keeps on harking on that, but that is not the case. That is not what she said.

In her mind she made the connection. And, obviously, you don't have to be a genius to make that connection, that being:

(A)  I'm being stopped. I'm driving. It's my car.

(B)  I have a child that's in custody — in the custody of the state for whatever I did.

(C)  What's gonna happen is that I'm not gonna be able to get that kid.

And, you know: Look. I mean, *I don't think that woman is credible at all*. Frankly, at all. *I don't think you can give her any credence*. I mean, clearly, she is a human being and she's gonna go ahead and love that kid; she's gonna want that kid back; and she's gonna do anything for that kid, or to try to get that kid back. And that's what she told you. She didn't say the officers went and said, you know, if you don't do this or that, you're not gonna get your kid. That's not at all what she said.

Third reason she had to lie in this case when she was stopped. She was driving without a driver's license, a valid driver's license. You can go to jail for that, especially somebody that has a record like her. And what's the meaning of that? Again, the meaning of that is that the whole thing with her getting her child back is certainly gonna be jeopardized. Again, you don't need to be a genius for that.

And so what happens? She gives a statement. They let her go; they let her go in her car and she's driving without a license. Now, so we established the first thing: This person has not one, several reasons, several motives to lie. Number two, she has lied. And we know that already. We know that. She tells one story to the officers. Then she testifies not once, she testifies twice before the Grand Jury, earlier in

the — in this year, earlier in 2003. She testifies twice.

And I went with her through a whole litany of questions in which I asked her: What you told the officers on that morning, that early morning of August 22nd, 2002, what you said about Mr. Weatherspoon having the gun, that was lie; what you said about Mr. Weatherspoon dropping the gun, that was a lie; what you said about Mr. Weatherspoon sliding the gun under the seat, that was a lie. And her responses were very clearly yes, they were lies. Yes, they were lies. And, yes, they were lies. *And she, again, said that under penalty of perjury and under oath twice before the Grand Jury. And she is, again, here under penalty of perjury and under oath telling you this thing — the same thing.*

*So, clearly, we have somebody that's lying and is lying in a massive way.* And, quite frankly, did she lie when she was stopped the first time? She surely had a huge reason to lie then. Or did she lie later? I don't know. I do not know when she lied, but she has lied. And can we trust the witness? No, we cannot trust that witness with such a huge decision. With the type of decision you need to go ahead and make today, you cannot trust that witness. Because if you trust that witness with that type of decision, believe me, what you'll be doing, again, is a torch that has been passed on for centuries will be extinguished. You cannot speculate here. You simply cannot go ahead and do that.

. . . .

Now, remember to go ahead and touch upon a couple points here regarding Mr. Harris. Should you believe Mr. Harris? Again, the question being:

Should you make the most important decision in your life based upon the testimony of that individual?

One of the things that you'll see here in this jury instruction that the judge gave you is that one of the things you need to go ahead and — and observe in making the decision is the witness's manner. You may; you may not have. But I believe you probably did. As he's leaving the stand, the individual's cussing. He had absolutely no respect for the whole system. Do we trust him on that? *I don't think so.*

This is an individual, also, that has a huge reason to lie. He told you himself. He said — he told you that on that day he was not arrested because he made the statement to the police. He was very clear on that. He said that he did not — he was not — he had warrants and he was not arrested because he made the statement to the police.

And, again, unfortunately, I'm just talking to you right now. The Government will talk to you again. And I will not have the opportunity to go ahead and — and rebut what the Government has to say. I would love to have that opportunity. So listen to what I'm gonna say and, you know, you submit it to a filter, to a critical filter now.

But this is a fellow, Mr. Harris, that not only has a reason to lie, apparently, according — he said it. He called it a stipulation. The stipulation was that if I wrote down a statement, I would go. There's no doubt that he said that. Now, this is an individual that not only has a motive to lie then — and by now he's already locked into that story. He knows that if he, you know, waffles from that story then he is gonna be looking at problems, at legal problems.

Now, he tells us at least three different stories. First story he tells us is what he tells the officers at the scene. He says he sees Mr. Weatherspoon with a gun. Okay? *Now, he tells the Grand Jury a very different story now*. He testified twice before the Grand Jury. And the Government may want to say that he was confused. I beg to differ. I mean, I really beg to differ. I mean, again, that's — that's — I just don't see it that way. But when he testified — this is February 19th, 2003, testified at 10:30 in the morning; testified at 11:00 o'clock in the morning — he goes to bat at 10:30 in the morning. Okay? And he is asked by the Government, "And you saw him pull something out of his waistband?" "Yes."

. . . .

And he said, "Yes." He said he saw him pull something out of his waistband.

Then he says, "A gun?

"A gun.

"A gun. And was it a handgun?

"Yes.

"When you saw him pull that handgun out, what did he do with that gun?

"He put it under the seat.

"Put it under the seat?

"Uh-huh. Right where they find it at.

"And when he pulled this gun out and put it up under the seat, was it prior to police pulling you over?

"Yes. It was before the police pulled over."

Then he testifies just half an hour later and he's asked:

"Okay. When you saw him pull this gun out, did —

"I didn't see him pull it — pull it out. I didn't see him pull it out."

So here we have a fellow that's from 10:30 to 11:00 — to 11:00 o'clock, in a period of a half hour, he's telling one story that's radically different from the one he's trying to tell us half hour after. Okay? He first of all had told us that, oh, he saw everything now. He saw the guy go ahead and pull the gun, slide it under the seat, et cetera; but later on at 11:00 o'clock all of a sudden he doesn't.

He goes back at 11:00 o'clock to the story that he told the police officers. So I guess at 10:30 he figured maybe it would be nice if I embellish this story. Maybe it would [be] nice if I make it sound a little sexier. Then I don't know he got a little concerned or whatever happened. But certainly — all of a sudden, in less than half hour, he is changing his story and going back to what he told the officers at the scene.

Third time that we know that this fellow has lied was when he was here. And I asked him, "Did you tell Mr. Heddy that Mr. Weatherspoon didn't have a gun?" And then he starts with a, well, I was thinking

was it during the day; was it . . . Again, come on. Come on. It's clear what he was being asked about. This fellow was being asked with — did Mr. Weatherspoon have a gun at the time of the stop? Did Mr. Harris see him with a gun? Mr. Heddy showed him the statement he made to — to the police. And Mr. Harris told Mr. Heddy that, no, he did not see a gun.

Now, do you wanna buy his weaseling out of the — well, I don't know if you were talking about the day or, you know, I don't know if you're talking about a year after or a year before. Come on. I mean, I think that — again, being your duty is a duty that is very hard. It's a huge responsibility. But, as I discussed in opening statements, the only thing you need to go ahead and do to perform that duty — and that's the beauty of it — is to keep an open mind, apply common sense, put the Government to its burden. Okay? And, if you do those three things, you can see that the story of Mr. Harris is ridiculous.

And yet the Government is trying to go ahead and go with that. The Government is trying to go ahead and play — whachamacall it? — said semantical or grammatical games, whatever you even want to call it. I mean, this man was shown by Mr. Heddy in his house in a totally comfortable environment — the absence of any type of pressure, absence of any type of promises or anything to that effect — he was shown the statement that he gave to the officers on August 22nd, 2002, about 4:00 o'clock in the morning and that Mr. Harris said that, no, he did not see the gun; that Mr. Weatherspoon [sic] did not see a gun.

Now, can you go ahead and, again, make one of the most important decisions, if not the most impor-

tant decision of your life based upon some weaseling over, oh, I didn't know whether he was talking about during the day. Of course it wasn't during the day. I mean, they took him in — you know, they arrested him and they took him. Of course, it wasn't the day. Common sense dictates clearly that what Mr. Heddy and Mr. Harris were talking about is the subject matter of that statement that was in front of Mr. Harris right then and there as Mr. Heddy was questioning him.

According to the Government, Mr. Harris may have gotten confused by Mr. Heddy. Well, gee, I mean, again, you know, is that something — are you gonna be comfortable making that decision? Are you gonna be comfortable returning a guilty verdict based upon the fact that Mr. Harris may have gotten confused when it was clear what Mr. Heddy was asking him? I don't think so.

You heard the evidence just as well as I did. As I said in opening argument, *I wouldn't — I wouldn't trust either of those witnesses asking them where's — where's the nearest 7-Eleven if I'm driving through that particular neighborhood. I just wouldn't because they would go ahead and lie. Those are individuals — individuals that have a reason to lie and have lied, both.*

(emphasis added).

In rebuttal argument, the prosecutor responded as follows:

THE PROSECUTOR:

I want to address a couple of points that Mr. Valladares talked about. He mentioned to you the fact that the only reason why Ms. Taylor wrote this state-

ment is because she was concerned about her children. That's what she was concerned about, that was her — her tie to her children was closer than her tie to her fiancé. Well, if she was so concerned about her children and gettin' them back, why was she engaged to a convicted felon? Why was she hanging around this guy? Answer that. That's common sense.

*I want to talk about the two statements that you've heard about and the consistency in both statements*: Ms. Taylor's statement about her observing Kendrick drop the weapon on the floor and slide it underneath the seat and Mr. Harris's statement that he told you on the stand. What did he say about the motion? He showed you: pulled it out, put it underneath the seat. Consistent. Consistent with her handwritten statement; consistent with what he said today. It's not uncontradicted. It's what they've all said.

And Mr. Valladares talked about the fact that these police officers told Mr. Harris that he had outstanding warrants and if he got a loaded gun. He could have a loaded gun. He never addressed that. Was that ever addressed by Mr. Valladares, the fact that he could legally have a gun? Never was. He said, oh, they came up with a story when they were gettin' pulled over. Well, why wasn't the story: Okay, Mr. Harris. You take the gun? Because it wasn't the truth. The truth was Mr. Weatherspoon had the gun. If they were gonna come up with a story, the story would have been Mr. Harris had the gun because he could legally have it. He wouldn't have been arrested for that.

And they make you out to believe that somehow these cops weren't bein' honest. And, if you remember what Ms. Taylor said, she said, I can't remember which one of the officers talked to me about my chil-

dren and gettin' them back, but I know they did. That's what she said. That's what Mr. Valladares talked about. He said they threatened Mr. Harris with warrants. *Let me ask what these police officers had to gain from comin' in here and lyin'? What do they have to gain to come in here and fabricate this story? They had no reason to lie in this case or not tell the truth.*

MR. VALLADARES: Your Honor, again, this is vouching, sir.

THE COURT: Overruled.

THE PROSECUTOR: They had no reason to come in here and not tell you the truth. And they took the stand and they told you the truth.

I guess, if you believe Mr. Valladares, they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge; they lied to me; they lied to my agent, Agent Baltazar. I guess they lied to the dispatcher when they called it in. *These are officers that risk losin' their jobs, risk losin' their pension, risk losin' their livelihood. And, on top of that if they come in here and lie, I guess they're riskin' bein' prosecuted for perjury. Doesn't make sense because they came in here and told you the truth, ladies and gentlemen.* They didn't threaten. There was no coercion. None of that was evident. They are gonna come in here and form this conspiracy to lie over a traffic stop? Doesn't make sense.

This defendant was a felon and knew he couldn't have a gun. That's what this case is about. He knew he didn't have a gun so he pulled it out and put it under the seat when the officer was pullin' him over.

Mr. Valladares talked to you about how important Ms. Taylor was and her testimony and this and this. I ask you again: Why wasn't she ever interviewed by their investigator? Why didn't he go out there and talk to her, get her statement, find out? She's so important. The first time they ever talked to her was right here. No evidence they went out and talked to her, tried to find out information. Never. Never once.

You remember the testimony. Ms. Taylor says the gun wasn't hers; wasn't her mom's gun. She says in her handwritten statement on that night, that voluntary statement, whose gun it was. It's consistent with Mr. Harris's statement.

Mr. Valladares tried to say that somehow having traffic warrants and having a gun would have got him in trouble. There's no evidence of that. I'm not sure what that charge would be, but he can legally have a gun, Mr. Harris. No incentive to lie. *He told you the truth up here on the stand, the same truth that he told at the time when he wrote out that statement, same thing he said to the Grand Jury.*

Mr. Valladares went through this whole thing in his closing talking about democracy and what's goin' on over seas militarily. He's trying to shift the focus away from the facts because the facts in evidence in this case show the defendant is guilty. That's why he's focusin' on that.

He also mentioned that Investigator Heddy when he went out to talked [sic] to Mr. Harris was in the comfort of his home. I ask you to remember the testimony. Officer Heddy [sic] testified it was outside in the middle of the day while he was workin' on his car. It wasn't inside his house. I ask you to remem-

ber that the way that you heard it from the witness stand. I don't think that occurred.

I also find it ironic that this statement that the investigator went out to get: No other witnesses there. Never brought another witness with him. Didn't get a written statement. Didn't get a tape-recorded statement from him. None of that.

(emphasis added.)

The alleged vouching here relates first to the prosecutor's words regarding the testimonial conflict between the officers and Vaneshia Taylor:

THE PROSECUTOR:

Let me ask what these police officers had to gain from comin' in here and lyin'? What do they have to gain to come in here and fabricate this story? . . .

MR. VALLADARES: Your Honor, again this is vouching, sir.

THE COURT: Overruled.

The court was correct in its ruling. Faced with an attack on the credibility of the officers, the prosecutor did no more than state, albeit as rhetorical questions, that the officers had no demonstrated motive to lie — in contrast to Vaneshia Taylor who did. The final statement, "They had no reason to lie in this case or not to tell the truth," does no more than reflect the record, which in fact contains no evidence of a motive on the part of the police falsely to deny Vaneshia Taylor's accusations. This argument read in context contains not a hint of extra-record information in the hands of the prosecutor, and it does not imply — explicitly or implicitly — that the prosecutor was monitoring in some fashion the truthfulness of the

officers' testimony. *See Perez*, 144 F.3d at 210 ("Because the prosecutor did not 'imply the existence of extraneous proof' we cannot say that his statements were an improper vouching for the credibility of witnesses.").

After asserting in rebuttal that Taylor lied on the stand and that the officers had no reason to do the same, the prosecutor continued to discuss what incentives the officers had not to lie or to fabricate a story:

> I guess, if you believe Mr. Valladares, they must have lied at the scene there; they came into this court and they lied to you; they lied to this judge; they lied to me; they lied to my agent, Agent Baltazar. I guess they lied to the dispatcher when they called it in. *These are officers that risk losin' their jobs, risk losin' their pension, risk losin' their livelihood. And, on top of that if they come in here and lie, I guess they're riskin' bein' prosecuted for perjury. Doesn't make sense because they came in here and told you the truth, ladies and gentlemen*. They didn't threaten. There was no coercion. None of that was evident. They are gonna come in here and form this conspiracy to lie over a traffic stop? Doesn't make sense.

> This defendant was a felon and knew he couldn't have a gun. That's what this case is about. He knew he didn't have a gun so he pulled it out and put it under the seat when the officer was pullin' him over.

(emphasis added).

Although, the defense registered no objection to this argument, here, Weatherspoon claims the references to the officers risking the perils of perjury was improper.

We addressed a similar claim based upon a similar argument in *United States v. Combs*, 379 F.3d 564 (9th Cir. 2004),

a case decided after the trial in this case. There, the prosecutor argued in rebuttal, as the prosecutor argued here, that an officer whose credibility had been challenged had no motive to lie:

> Most of all, ladies and gentlemen, you have to believe that Special Agent Kent Bailey is a liar. If you believe the defendant's version of events, you have to believe that Special Agent Kent Bailey walked up to that witness stand, swore to tell you the truth, and perjured himself.

> You have to believe that Special Agent Kent Bailey flushed his ten-year career down the toilet. For what? For a nice old grandfatherly man? Why would he do that? That makes no sense. Special Agent Bailey may not get fired for participating in a search warrant where there was no meth lab, but you can be darn sure he would get fired for perjuring himself.

*Id.* at 568.

The defense in *Combs* did not object to this line of argument. Nevertheless, for a variety of reasons, we concluded that this argument constituted reversible vouching plain error because; "[a]lthough the prosecutor may not have vouched for agent Bailey on a personal level, she plainly implied that she knew agent Bailey would be fired for committing perjury and that she believed no reasonable agent in his shoes would take such a risk." *Id.* at 575. We noted also that "[t]he jury could easily have inferred that the district court was monitoring Agent Bailey's veracity in light of its role in reprimanding Combs and requiring him [improperly] to testify that agent Bailey was a liar." *Id.* at 575-76. We noted also that "agent Bailey's credibility was critical to the government's case, as there was no direct evidence linking Combs to the charge of manufacturing methamphetamine." *Id.* at 576. Moreover, we concluded on the particulars of that case that the court's gen-

eralized instructions not to regard arguments as evidence were not sufficient to neutralize the problem. *Id.* at 575.

A careful comparison of the case at bar with *Combs* convinces me that the two are materially distinguishable:

(1) the prosecutor here did not force the defendant to testify that the agent was a liar. In fact, the defendant here did not take the stand;

(2) it was the defense who, throughout the trial, repeatedly raised the issue of perjury, specifically with Vaneshia Taylor and with Harris. The defense argued to the jury that they could trust that Taylor told the truth before the grand jury because she was under oath and testifying under penalty of perjury. Similarly, the defense effectively accused Harris of perjury in the same forum;

(3) the judge gave no hint of monitoring the veracity of anyone's testimony, including the officers;

(4) the agents' credibility, and the issue of whether they caused Taylor to lie by threatening her with an arrest, pertained to a satellite issue, not directly to the central question of who possessed the gun. Taylor's written statement itself, even when viewed in the light of her suspect repudiation of it, clearly provided its own evidence of its veracity; and

(5) the prosecutor in *Combs* said, "you can be darn sure [agent Bailey] would get fired for perjuring himself." *Combs*, 379 F.3d 568. This categorical statement is tantamount to a guarantee from the prosecutor that Bailey was telling the

truth, whereas here, the prosecutor's statement referred not to what the prosecutor might do, but to the *witness's* motive or incentive not to lie under oath.

In fine, I conclude that even if we were to regard the prosecutor's references in this case to possible perjury charges as error, the error did not prejudice Weatherspoon's " 'substantial rights' " and did not " 'seriously affect[ ] the fairness, integrity, or public reputation of' " his trial. *Combs*, 379 F.3d at 576 (quoting *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002)).

This case is more like *United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999), than *Combs*. In *Daas*, faced with allegations that her witnesses, the Bilkoos, lied, the prosecutor said,

> Their plea agreement calls for them to be completely truthful. If they do that, they can get their sentences reduced. If they don't do that, then they don't get a sentence reduction, and they do more time. So their motive is to tell the truth, not to lie. If they were to lie under oath, they would face perjury prosecution as well.

*Id.* at 1172. Oddly enough, the prosecutor conceded in the trial court during Daas's motion for a new trial that this remark constituted vouching, but on appeal, *we* disagreed and disregarded the concession. Citing *United States v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987), for the proposition that a "concession by the government as to a legal conclusion is not binding on this court," we held that "the prosecutor's reference to the possibility of the Bilkoos' prosecution for perjury was at worst mild vouching" and did not "amount to reversible error under the plain error standard of review." *Id.* at 1179, n.14.

References to the potential of false testimony to result in perjury charges without a suggestion of information outside

the record or vouching strike me as unremarkable. Jurors see all witnesses take an oath to tell the truth before they testify. This common ritual is required by Rule 603 of the Federal Rules of Evidence:

> Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.

The Advisory Committee note to Rule 603 states, "perjury by a witness is a crime, 18 U.S.C. § 1621." Perjury includes testimony under oath regarding a material matter which the witness does not believe to be true. 18 U.S.C. § 1621. These concepts are legal, to be sure, but they are also concepts that persons not trained in the law surely understand. I doubt that there has ever been a jury that did not understand that false testimony carries with it the risk of prosecution for perjury. Therefore, references to the oath and the consequences of violating it without improper promises and guarantees, such as we find in *Combs*, ordinarily will not constitute reversible error.

## E.

I come next to the most serious and troublesome claim lodged against the prosecution: urging the jury to convict in order to protect the community from an armed convicted felon. Because the prosecutor now justifies the disputed argument as a fair response to an argument made by the defense, I begin with the defense's argument to which the prosecutor points:

> MR. VALLADARES: But the question, the fundamental question you've got to ask yourself in doing this is: Are you gonna be comfortable with that decision tomorrow? next week? a year from now? five

years from now? Are you gonna be comfortable with that — with that kind of evidence that you heard today? And — and, again, let's not fool ourselves. The evidence is far from clear in this case.

To which the prosecutor responded:

THE PROSECUTOR: Members of the jury, Mr. Valladares asked you in the beginning of his closing, are you gonna be comfortable with your decision here today? in five days? five years? Whatever he said. Are you gonna be comfortable? Let me tell ya this: Convicting Mr. Weatherspoon is gonna make you comfortable knowing there's *not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around loaded semiautomatic —*

MR. VALLADARES: Objection, your Honor. Inflammatory, sir.

THE PROSECUTOR: Your Honor, I'm responding to what he said in his closing.

MR. VALLADARES: That's not a fair response to my argument, sir.

THE COURT: We don't refer to punishment in this argument. We're talking about guilt or not guilt. Argue to that.

THE PROSECUTOR: *You can feel comfortable knowing there's a convicted felon that's been found guilty of possessing a loaded firearm, a fully loaded semiautomatic handgun.* And let me tell ya this: Jurors just like yourself in juries all around this country go into courtrooms just like this every day and find defendants guilty under the same standard

that you're gonna have before you. Happens every day in this country. And that torch he talks about happens every single day: same standard, beyond a reasonable doubt. Happens all the time. That's the same burden. It's the same thing you're gonna have to decide. It happens all the time. Convictions, all the time.

Mr. Valladares talked about your decision will affect the life of a human being. But the law of being a felon in possession of a firearm, that protects a lot of people out there also.

MR. VALLADARES: Again, that's inflammatory, sir.

THE PROSECUTOR: Your Honor, he made the statement in closing that this affects a human being.

MR. VALLADARES: It does, your Honor.

THE COURT: Let's — let's just talk about guilt or nonguilt.

THE PROSECUTOR: *And finding this man guilty is gonna protect other individuals in this community.*

MR. VALLADARES: Your Honor, objection, sir.

THE COURT: Your objection is overruled. When there is a serious objection, I will rule in your favor on it. At the moment, please let the Government complete its argument.

MR. VALLADARES: Yes, sir.

THE PROSECUTOR: Thank you, your Honor.

(emphasis added).

We have squarely addressed this species of argument before, saying:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*Koon*, 34 F.3d at 1443 (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)).

The prosecutor's argument violated this rule, and the trial court plainly abused its discretion when it failed to sustain counsel's timely objection. The vice of the prosecutor's argument in this case was exacerbated by Weatherspoon's status going into the trial as a convicted felon. Yes, the jury knew this fact by way of a stipulation to this *element* of the crime, but the prosecutor's argument by emphasizing the "convicted felon" formulation of Weatherspoon's status was a "to-protect-others-in-the-community, let's-get-Weatherspoon-off-the-street-because-he-is-an-armed-convicted-felon" argument, not just a reference to an element of the defense. This sort of argument in a case where the charge is felon in possession of a firearm is singularly inappropriate. Weatherspoon's stipulated status as a felon per se could not be used as evidence to convict him of this crime of possession, rather, *only* to satisfy one element of it.

As we said in *Commonwealth of N. Mariana Islands v. Mendiola*, 976 F.2d 475 (9th Cir. 1992), *overruled on other*

*grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997):

> While commentary on a defendant's future dangerousness may be proper in the context of sentencing, it is highly improper during the guilt phase of a trial.

*Id.* at 487.

The government's response to this claim is understandable but unconvincing. The government says defense counsel "invited" this argument when he:

> [R]epeatedly called into question the testimony of the Government witnesses, called the Government's evidence "laughable", frightened the jury by demanding that they be "comfortable taking a man's liberty", equating their jury service to fighting in the United States Armed Services overseas, and scaring the jurors into believing that our United States "democracy will end" if they speculate in this case.

I disagree. I discern nothing improper in defense counsel's argument, and certainly nothing that would justify the prosecutor's remove-an-armed-convicted-felon-from-the-street argument. The defense did no more than emphasize to the jurors the solemnity of their responsibilities. The government's claim that the argument was merely "righting the scale," citing *United States v. Wallace*, 848 F.2d 1464 (9th Cir. 1988), is equally unconvincing. This bad-man-with-a-gun argument placed a serious prejudicial consideration on the scale against Weatherspoon that should not have been there.

### III

My conclusions regarding the prosecutor's improper argument leads to the final issue: was this error harmless? In other

words, did the prosecutor's improper argument so affect the jury's ability to consider the totality of the evidence fairly that it "tainted the verdict and deprived [Weatherspoon] of a fair trial." *Smith*, 962 F.2d at 935. To answer this question, we must determine " 'whether [the] improper behavior, considered in the context of the entire trial, including the conduct of the defense counsel, affected the jury's ability to judge the evidence fairly.' " *United States v. Brown*, 327 F.3d 867, 871 (9th Cir. 2003) (citation omitted). My answer is that the error here " 'more probabl[y] than not materially affected the verdict.' " *Id.* at 872 (citation omitted).

The direct evidence in the government's case purporting to link Weatherspoon to this gun came from extremely shaky civilian witnesses. After calling officers to establish that they found the gun under the car's passenger seat, the prosecution called Vaneshia Taylor as its first direct evidence witness. Ms. Taylor, we note, was not called to testify that Weatherspoon possessed the gun, but instead as a hostile witness in order to use her prior written statement against him, a statement which she heatedly said was false insofar as it inculpated her boyfriend. The record makes it clear that no juror thinking clearly could attach much weight to anything Vaneshia Taylor said — at anytime. She either lied to the police, or she lied under oath — both before the grand jury and at the trial. The record demonstrates that whatever she says and whenever she says it, her words are not worthy of belief.

The government's next direct evidence witness was Donald Harris, whose testimony when objectively examined, as explored in Part III C., *supra*, of this opinion, was equally unimpressive. Discovered in a car under uncomfortable circumstances and with unsavory companions, and in exchange for not being arrested on outstanding traffic warrants, he wrote a statement fingering Weatherspoon as the possessor of the gun. The problem with his trial testimony is twofold.

First, he told the grand jury under oath he actually "saw" Weatherspoon "pull the gun from his waistband and put it under the seat," where the police found it. On cross-examination at trial, however, he testified that he did *not* see Weatherspoon pull a gun out of his waistband and put it under the seat. Instead, he admitted, "I couldn't have seen him — if he — I mean, I'm pretty sure he pulled it out and put it up under the seat true enough. But, no, I can't sit here and tell you that I seen him — all I seen was a motion."

During direct examination of Harris, the prosecutor had sidestepped this discrepancy between Harris's grand jury testimony and his trial testimony by deftly ignoring it — instead of explaining it to the jury.

What emerges from Harris's performance as a witness is a picture of a person too willing to please the government with respect to his testimony. It is clear from his answers on direct as compared to his answers on cross and his grand jury testimony that he had consciously refined, or, in his words, "corrected," his testimony between his appearances as a witness.

The second weakness in Harris's testimony pertaining to the gun arises from what appears to be a prior inconsistent statement. When Harris talked prior to the trial to Weatherspoon's counsel's investigator, Harris said he had *not* seen Weatherspoon with a gun. Harris's explanation for this discrepancy was that he understood the question to mean "that day," and that he did not consider the question to cover "3:00 o'clock in the morning." This cute explanation is hardly convincing, especially from a witness who testified also that the only reason he wrote out a statement implicating Weatherspoon was because the police discovered he had outstanding traffic warrants, and it was either "write a statement," or "go to jail." So, he wrote his statement, and the police let him go, the warrants for his arrest notwithstanding.

Any fingerprints on the gun or other evidence linking Weatherspoon to it? No. Thus, the direct evidence we are left with

is (1) a gun found under the passenger seat occupied by Weatherspoon in a car owned by Vaneshia Taylor's mother, not the appellant, (2) the testimony of two flocculent witnesses, and (3) nothing else.

Although the totality of the evidence against Weatherspoon would have been sufficient to support a guilty verdict if it were to have resulted from a fair trial, it is far from strong — indeed, it is demonstrably weak and in part untrustworthy. Weatherspoon very well may have put the gun under the seat, but the prosecution's *evidence* swims uphill to prove its case beyond a reasonable doubt.

Accordingly, I conclude that the prosecutor's improper rebuttal argument was not harmless error. Instead, the get-an-armed-convict-out-of-the-community argument more probably than not tainted and explains the juror's guilty verdict. It follows that the defendant's trial violated Due Process as guaranteed by our Constitution, and the judgment of conviction against him cannot stand.

**IV**

Although I conclude that the prosecutor's alleged vouching episodes were not error, I take this opportunity to suggest that a careful prosecutor could easily and professionally have avoided these allegations of misconduct simply by making it clear that what he was saying in argument amounted to nothing more than observations about relevant matters in the evidentiary record. It is an easy task for an informed federal prosecutor to steer clear of the danger areas identified in federal case law and to stick to the task at hand. The purpose of argument is "to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000) (citing *United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990)). *Young* must not be read as an open invitation to fight fire with fire. A prosecutor has a higher duty than to make the equivalent of

he-hit-me-first arguments. *See Berger v. United States*, 295 U.S. 78, 88 (1935).

This said, I am convinced that our Circuit has extended the concept of vouching far beyond its core due process concerns and bluntly misinterpreted it in many cases to cover arguments directed only to the impact and meaning of the evidence. The vouching analysis in this case proves my point. As we suggested in *Davis*, a lawyer's *argument* regarding the meaning and significance of the evidence in a case represents the lawyer's opinion. *Davis*, 564 F.2d at 846. What else could it be? Jurors know this. Is it vouching every time a lawyer says "I believe," or "I submit," or "I think?" Of course not, but our opinions too often jump inappropriately to the conclusion that such formulations necessarily amount to impermissible "vouching." I tried cases in state and federal court on and off for twenty-three years, and this is the way lawyers talk. It is no more vouching than forcefully saying, "The evidence shows beyond a reasonable doubt that Weatherspoon is guilty." Who says so? The prosecutor says so. It is the prosecutor's *opinion*. It adds nothing to say "I submit," or "I believe," or "I think." The standard instructions make this clear to the jurors. Every argument I ever heard was *the lawyer's opinion about the impact of the evidence*. So, unless the argument conveys "the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant" or invites the jurors "to trust the Government's judgment rather than its own view of the evidence," the argument does not constitute vouching, period. *Young*, 470 U.S. at 18. These observations notwithstanding, however, prosecutors must take care not even to approach the danger zone.

While I am at it, discussing in argument common sense reasons why a witness might tell or not tell the truth isn't improper either. Jurors are always exhorted to use their common sense to judge credibility. Attorneys argue all the time that witnesses can't be trusted because they have "a motive to

lie." Why should a lawyer be prohibited from arguing that a witness has a motive not to lie because the consequences for the witness will be personal disaster?

In a motion for Modification of Published Opinion, which I have granted in part, the United States Attorney for the District of Nevada candidly recognizes the mistakes made by his assistant and ascribes them to "a lapse of supervision (both at the trial and appellate level) on the part of the management of the office, as they are the result of the shortcomings in the training and experience of the prosecuting Assistant United States Attorney." The United States Attorney assures us that the errors of his assistant did not arise from an unethical design, but from a management failure in his office. I accept the United States Attorney's willingness personally to take responsibility for these errors, errors which suggest in turn that the United States Attorney would be well advised constructively to review the methods of supervision and training that exist in his office, and to conduct for his trial lawyers a seminar on the permissible bounds of argument *in the Ninth Circuit*. Reversals on appeal because of prosecutorial missteps and resulting retrials are a brutal waste of time and valuable resources.[1] The issues in this case were easily avoidable.

---

[1]*See United States v. Culverson*, No. 04-10338 (9th Cir. Dec. 14, 2004) (order terminating the case on the merits after submission without oral hearing, reversed and remanded to district court for new trial); *United States v. Williams*, 112 Fed. Appx. 581, 2004 WL 2370557 (9th Cir. Oct. 21, 2004); *United States v. Green*, 119 Fed. Appx. 133, 2004 WL 2984356 (9th Cir. Dec. 28, 2004).