## A04A1021. LEMONS v. THE STATE.
(608 SE2d 15)

MIKELL, Judge.

A jury convicted William Lemons of kidnapping and four counts of armed robbery. Lemons raises the following issues in his appeal: (1) insufficient evidence supports his convictions; (2) a show-up identification was inadmissible; (3) a mistrial was warranted after a state's witness commented on his request for counsel; (4) his cross-examination was unduly restricted; and (5) the district attorney improperly bolstered a witness with statements about his personal belief in the witness's veracity. For the reasons set forth below, we affirm.

1. Lemons contends his convictions should be reversed because the victim's identifications "were not positive and sufficient." "On appeal, the evidence must be viewed in the light most favorable to the verdict and the appellant no longer enjoys the presumption of innocence; moreover, on appeal this court determines evidence sufficiency and does not weigh the evidence or determine witness credibility." (Citation and punctuation omitted.) *Williams v. State*, 217 Ga. App. 636, 638 (3) (458 SE2d 671) (1995). Viewed in this light, the record shows that during a twelve-day period, four delivery drivers from four restaurants were robbed at gunpoint while making deliveries to three apartment complexes located close together. A witness, who knew both Lemons and the delivery driver, saw a portion of the fourth robbery, resulting in Lemons's arrest.

### First Robbery

On May 27, 2000, around 9:00 p.m., a Pizza K dispatched Frederico Cabral to deliver pizza to apartment number 1605 in The Oaks apartment complex. It was very dark when Cabral arrived to make his delivery and the apartment was located in the back of the building. After he knocked on the door, a man holding a gun approached him, put the gun against his chest, and demanded money. Cabral complied and the robber ordered him to take off his shoes. The robber ran away while Cabral took off his shoes.

Cabral testified that he was face-to-face with the robber and that the gun was small and silver. He described the gunman as a dark-complexioned African-American "about six feet tall, not even that," with "a goatee, maybe a mustache with a goatee." He acknowledged the he did not get a good look at the robber because he was avoiding face contact and focusing on the gun.

Three or four weeks after the robbery, Cabral met with a police detective who showed him a photo lineup, but Cabral was unable to make a positive identification and signed a form to this effect. After

signing the form, Cabral took "a wild guess" and pointed to one photo that he thought fit the description and the detective told him "that wasn't it."

When asked at trial if he had ever seen the robber again, Cabral stated, "[n]o, not until now." When specifically asked if he recognized anyone in the courtroom from the night of the robbery, Cabral replied, "[n]ot specific, but there is some resemblances."

## Second Robbery

On June 5, 2000, around 7:00 or 8:00 p.m., Wok Express dispatched Chao Ye to deliver Chinese food to the exact same location where Cabral was robbed nine days earlier. It was dark outside and as Ye walked toward the apartment, a man approached him, pointed a small silver gun at his head, grabbed his shirt, demanded his money, and commanded him to turn around. The man searched his pockets, took his money, and ran away. Ye testified that he could see the man's face because he was very close.

Ye described the robber to the police who initially responded to his report of the robbery as a black male in his 20s, clean-shaven, 5′8″ tall, 120 pounds, with a slim build. He later described the robber to a detective as 5′9″ to 5′10″ tall and weighing 160-170 pounds.

Six days after the robbery, Ye positively identified Lemons out of a photo lineup as the man who robbed him. At trial, Ye testified on direct examination that he was 90 percent certain his selection in the lineup was correct. During cross-examination, Ye testified that he told the detective at the time of the photo lineup that he was 70 to 80 percent sure that Lemons was the robber. Ye identified Lemons in court as the man who robbed him and explained that he can identify a person 100 percent when he sees them in person versus a picture.

## Third Robbery

On June 7, 2000, around 3:00 p.m., Lucky Chopsticks dispatched Weiyuh Choy to deliver Chinese food to a Magnolia Lakes[1] apartment that was located a few hundred yards from the restaurant. A person named Chad made the delivery request. As Choy walked toward the building with the food, a man with a hand in his sweatshirt walked toward him. After passing the man, Choy felt a hand holding his neck and an object stuck into his back. The man told Choy to put down the food. As he complied, Choy looked back and saw the robber's face and

---

[1] The name of the apartment complex was mistakenly identified as "Plantation" Lakes by the testimony of the delivery man.

a silver gun stuck in his back. The robber reached into Choy's front pockets and removed his loose money and wallet. The robber then instructed him to take off his shoes and pants and lie on the ground facedown. When Choy later turned around, he discovered the robber was gone and called the police.

Choy described the robber to the police as a black male in his 20s, 5'10" tall, 165-175 pounds, with a mustache. Choy also told the police he was unsure if he would be able to identify the person if he saw him.

A few days after the robbery, Choy met with a detective and positively identified Lemons out of a photo lineup as the robber. At trial, Choy testified that he remembered the robber had distinctive eyes and identified Lemons as the man who had robbed him after carefully looking at everyone's eyes in the courtroom.

### Fourth Robbery

On June 8, 2000, at 5:09 p.m., China Palace dispatched Ricky Halim to make a delivery in the Waterfall Village apartment complex. As Halim walked to the apartment approximately five minutes later, a man followed from behind, put one hand over his shoulder, put a small, silver gun to his back with the other hand, and ordered Halim to walk slowly toward woods near the apartment. The gunman then asked for his wallet and Halim turned around to face the robber and complied. The robber took the money out of his wallet and then searched his pockets for additional money. The robbery concluded when the robber told Halim to take off his pants and shoes and then ran away.

After the robbery, Halim went to apartment 1713C, where he made regular deliveries, and told the woman that he knew "very, very well" that he had just been robbed.

Kimberly McCoy testified that she lived in apartment 1713C in Waterfall Village. She explained that when she arrived home from work around 3:30 or 3:45 on the day of the robbery, Lemons and her roommate were in the apartment. Approximately 20-25 minutes later, Lemons and her roommate left to go to Wal-Mart. After they left, McCoy began cleaning her apartment. While cleaning with her patio door open, McCoy saw Halim walking toward her apartment, heard someone say "hey, yo, come here or whatever," and saw Lemons. She wondered why Lemons was back, assumed that he must have ordered the Chinese food, and then saw Halim walk away with Lemons toward some bushes. While they were walking, Lemons had his left arm around Halim's neck and McCoy thought they were talking. When Halim knocked on her door moments later and told her he had just been robbed, she realized she had witnessed the robbery and called the police.

A police officer was dispatched at 5:22 p.m., and arrived at McCoy's apartment at 5:30 p.m. McCoy described Lemons as wearing blue jeans, a blue shirt, and white sneakers at the time of the robbery. Halim described the robber to police as a black male with large, bulging eyes and a mustache.

McCoy's roommate, Gregoire LaBorde, testified that Lemons came to his apartment on the day Halim was robbed. During their visit, Lemons told LaBorde he was having financial problems, that he had no job, and no place to stay. Shortly after McCoy came home from work, LaBorde walked to work at a nearby Wal-Mart and Lemons accompanied him. LaBorde's shift began at 4:00 p.m. If he walked really fast, LaBorde could get to work in eight minutes. LaBorde and Lemons parted ways when LaBorde entered the front doors of the Wal-Mart. LaBorde did not see Lemons go inside.

Between 7:00 and 7:15 that evening, a detective went to the Wal-Mart to talk with LaBorde. LaBorde told the detective that Lemons planned to return to the Wal-Mart to pick up an organizer he had asked LaBorde to store for him. As the detective started to leave the store at 7:34 p.m., he heard a page for LaBorde telling him a visitor was waiting for him in electronics. The detective went to the electronics department, saw Lemons, and asked for identification. After verifying Lemons's identity, the detective handcuffed him and escorted him from the store.

Around 8:00 p.m., the detective called Halim, told him they had arrested a suspect, and asked him to meet them at the Wal-Mart to look at the man to see if he was the robber. When Halim arrived at the Wal-Mart, Lemons was standing outside a police car in handcuffs and the police informed Halim that Lemons was the man they had arrested. Halim was pretty sure Lemons was the robber, but looked at his face again and again to make sure he was the robber before identifying him as the robber. Halim informed the police that Lemons was wearing a different shirt than he had been wearing at the time of the robbery. Halim also selected Lemons out of a photo lineup and identified him in court as the robber.

After Halim identified Lemons as the robber, the police took Lemons to the police station and obtained a statement from him. Lemons told the police officer that after leaving LaBorde at the Wal-Mart, he went to Lenox Mall for awhile and then returned to the Wal-Mart to pick up his organizer from LaBorde.

At the time of his arrest, Lemons was carrying a Wal-Mart bag and had a Wal-Mart receipt for t-shirts; the receipt was dated that day and listed the time as 5:32 p.m. Lemons also had two receipts for stores in Cumberland Mall dated that day with times of 6:19 p.m. and 6:29 p.m. One of these transactions showed the purchase of tennis shoes with cash. The other showed a return transaction which

Lemons signed "Chad Overbrook." Lemons insisted to the police that he had been at Lenox Mall and could not explain why the receipts indicated he had been at Cumberland Mall.

Lemons testified at trial and denied committing the robberies. He claimed that he walked with LaBorde to Wal-Mart around 5:00 p.m., and then shopped in Wal-Mart for awhile before buying the t-shirts around 5:30 p.m. He then went to Cumberland Mall, where he bought shoes and made a return before returning to the Wal-Mart to obtain his organizer from LaBorde. Lemons could not explain why McCoy said she saw him at the time of the robbery or his whereabouts at the time of the other three robberies.

Lemons testified that he was about 5′8″, weighed 150-155 pounds and was 26 years old. The photo of him used in the lineup shows that he is African-American with a mustache and bulging, prominent eyes.

We find this evidence sufficient to support Lemons's convictions under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The four robberies were very similar and the last robbery was witnessed by a third party who knew both Lemons and the victim. Three of the victims identified Lemons from a photo lineup and in court. The one victim who could not positively identify Lemons was robbed at the exact same location where another victim, who could identify Lemons, was robbed. Finally, Lemons admitted using the alias Chad for a return transaction and someone named Chad placed the order for delivery in one of the robberies. The fact some of the victims' identifications were less than 100 percent positive does not render the evidence against Lemons insufficient.

> The weight and credibility of witnesses are questions for the triers of fact; that some evidence offered by a witness seems contradictory to his own or to some other's, or incomplete or uncertain, does not automatically discredit the evidence given by that witness for it is the function of the triers of fact to determine to what evidence it gives credence. It is not for us to determine or question how the jury resolved any apparent conflicts or uncertainties in the evidence. Rather, on appeal, we indulge every contingency in favor of the verdict.

(Citations and punctuation omitted.) *Norris v. State*, 220 Ga. App. 87, 88-89 (1) (469 SE2d 214) (1996) (rejecting defendant's argument that victim's identification testimony "too contradictory and speculative" to support armed robbery conviction).

2. Lemons argues the trial court should have granted his motion to suppress the show-up identification made by the victim of the fourth robbery. "An identification by showup is admissible so long as

under the 'totality of the circumstances' the identification is reliable, even though the confrontation procedure may have been suggestive." (Citations omitted.) *Clempson v. State*, 144 Ga. App. 625-626 (1) (241 SE2d 495) (1978). "In making this determination, we consider the witness' opportunity to view the suspect at the time of the offense, the witness' degree of attention, the accuracy of the witness' prior description, the witness' level of certainty, and the length of time between the crime and the identification." (Footnote omitted.) *Hooper v. State*, 251 Ga. App. 533, 535 (2) (554 SE2d 750) (2001).

In this case, the show-up identification occurred less than three hours after the robbery, the victim had a good opportunity to view the robber's face as it was uncovered and the robbery occurred while it was light outside, the victim focused on the robber's face during the robbery, the victim was certain of his identification of the robber both in and out of court, and the victim's description was generally accurate. "Under the totality of these circumstances, the evidence supported the trial court's conclusion that there was no substantial likelihood of irreparable misidentification." (Footnote omitted.) *Hooper*, supra at 536 (2). As a result, the trial court did not err by denying Lemons's motion to suppress.

3. Lemons asserts the trial court should have granted a mistrial after the detective testified during direct examination that Lemons had invoked his right to an attorney during a police interview. The testimony at issue follows:

Q. And when you discussed with him his receipts from the Cumberland Mall, what happened at that point?
A. As he started to be challenged on his information —
[DEFENSE COUNSEL]: Objection, Your Honor. That is not proper.
Q. Detective, when you posed your question about the receipts, what was his response?
A. He requested an attorney.

Defense counsel immediately objected and moved for a mistrial. The trial court denied the motion for a mistrial and gave the jury a curative instruction.

"[I]n order to warrant reversal of a conviction, the evidence of defendant's choice to remain silent must point directly at the substance of defendant's defense or otherwise substantially prejudice defendant in the eyes of the jury." (Citation omitted.) *Mitchell v. State*, 223 Ga. App. 319, 321 (6) (477 SE2d 612) (1996). As a result, "not every comment directed toward a defendant's silence will result in an automatic reversal." (Citation and punctuation omitted.) *Newton v. State*, 226 Ga. App. 501, 502 (1) (486 SE2d 715) (1997). And, "[t]he

grant or denial of a mistrial is within the trial court's sound discretion, and we will not interfere with the trial court's exercise of that discretion unless it is clear that a mistrial was essential to preserve the right to a fair trial." (Punctuation and footnote omitted.) *Knolton v. State*, 268 Ga. App. 78, 79 (601 SE2d 467) (2004).

In this case, Lemons's defense was one of misidentification. As the detective's testimony did not point directly at this defense, we must only consider whether it substantially prejudiced Lemons in the eyes of the jury. As the evidence against Lemons was overwhelming and the trial court gave a curative instruction to the jury, we find it highly unlikely that the testimony about Lemons's request for an attorney substantially prejudiced him in the eyes of the jury. See *Knolton*, supra; *Mitchell*, supra.

4. Lemons contends the trial court should have allowed him to cross-examine two of the four victims about their illegal immigration status and any possible hope of benefit they might have thought they could obtain by testifying for the state. The record shows that the state made no promises or offers to assist the victims with their immigration status and that the victims had not asked for any assistance in exchange for their testimony. When prompted by defense counsel, one victim agreed that "it would be nice" if the state would recommend that he not be deported. There was no evidence that this victim had a pending deportation or any other immigration proceeding.

Even if we assume that the trial court should have allowed defense counsel to cross-examine the victims about their immigration status and any subjective belief they might have had that testifying for the state might somehow have benefitted them, Lemons must still "show harm as well as error to prevail on appeal." *Cunningham v. State*, 240 Ga. App. 92, 94 (1) (c) (522 SE2d 684) (1999).

> Under the standards set out by the Supreme Court of Georgia, the "highly probable" test makes affirmance conditional on high probability that error did not affect the judgment. The test compels a judge to go beyond the appearances of the result to an examination of what causal links there may be between error and the judgment.

(Citation and punctuation omitted.) Id. at 94-95 (1) (c).

We find it highly probable that the outcome of Lemons's trial would not have been different had his counsel been allowed to cross-examine the victims in this area. See *Cunningham*, supra. The evidence against Lemons was overwhelming, there had been no discussions between the state and the victims about assistance with their immigration status, and there were no pending immigration proceedings against

the victims. Compare *Scott v. State*, 242 Ga. App. 850, 851 (527 SE2d 210) (1999) (error for trial court to preclude defendant from cross-examining state's witness about pending criminal charges). As no harm could have resulted from the trial court's limitation of Lemons's cross-examination, we find no merit in this enumeration.

5. Lemons argues the trial court should have allowed him to cross-examine a victim about a previous false statement under oath. The record shows that when the victim was initially questioned under oath about his immigration status outside the presence of the jury, he stated that he was a citizen. When he was later called to testify, he volunteered to the court outside the presence of the jury that he had misunderstood the question and explained that he was not a United States citizen.

While parties are entitled to a thorough and sifting cross-examination, this right is not unlimited; instead it "rests largely within the discretion of the trial court, and its discretion will not be disturbed on appeal unless it has been abused." *Moore v. State*, 251 Ga. 499, 501 (2) (a) (307 SE2d 476) (1983). Moreover, every witness has the right "to be examined only as to *relevant matter* and to be protected from improper questions and from harsh or insulting demeanor." (Emphasis supplied.) OCGA § 24-9-62. Since the witness's immigration status was not relevant to whether he was robbed by Lemons, the trial court did not err by limiting cross-examination into this issue. See *Cooper v. State*, 66 Ga. App. 594, 595 (18 SE2d 644) (1942). It is "well-settled law that a witness can not be impeached by proof of contradictory statements previously made by him unless such statements are as to matters relevant to his testimony and to the case." (Citation and punctuation omitted.) Id.

6. Finally, Lemons asserts that the state improperly bolstered a witness in its closing argument. See *Shirley v. State*, 245 Ga. 616, 617 (1) (266 SE2d 218) (1980) ("improper for counsel to state to the jury his personal belief as to the veracity of a witness") (citations omitted). The statements at issue follow:

> You have heard about the positive IDs. You have heard about the negative IDs. I want you to think in your mind when you factor into this evidence when you deliberate in this case what did Cabral say when he didn't pick anybody out? What words did he use to describe what the detective said back to him? The detective said no problem, man. That is — those were the words out of Cabral's mouth.

> If the detective is going about his business bolstering, creating, suggesting — as the defendant would have you believe — how in the heck could that have happened? And to take it

a step further, you even for a moment think that the detective would risk his career and —

[DEFENSE COUNSEL]: Objection, Your Honor. That is improper as to whether he would risk his career. That is not in evidence.[2] She's vouching for the credibility of a witness, and she can't do that.

[THE STATE]: Your Honor, I beg to differ. But I will be happy to move on.

THE COURT: All right.

We find no error because the statements "with which appellant takes issue are permissible since they are the conclusion the prosecutor wished the jury to draw from the evidence, and not a statement of the prosecutor's personal belief as to the veracity of a witness." (Citations omitted.) *Mason v. State*, 274 Ga. 79, 80 (2) (b) (548 SE2d 298) (2001). *Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED NOVEMBER 10, 2004 —
RECONSIDERATION DISMISSED DECEMBER 3, 2004 — ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Jo Ann Fields*, for appellant.
William Lemons, *pro se.*
*Patrick H. Head, District Attorney, Amelia G. Pray, Victoria S. Aronow, Assistant District Attorneys*, for appellee.

---

[2] Lemons does not assert on appeal that a reversal is warranted because the state argued facts not in evidence.