Merrimack
No. 2004-784

THE STATE OF NEW HAMPSHIRE

v.

WILLIAM MUSSEY

Argued: January 12, 2006
Opinion Issued: February 24, 2006

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Ted Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, William Mussey, was convicted of second-degree assault. RSA 631:2, I(d) (1996). The defendant argues that the Trial Court (*McGuire*, J.) erred by overruling his objection to a statement made by the prosecutor during closing argument regarding the motivation of the police officer witnesses to testify truthfully. We affirm.

The record reflects the following facts. In the early morning of January 12, 2004, the victim's mother took her three-year-old son to Concord Hospital. Emergency room physician Dr. Michael Lynch initially treated the victim for severe injuries to his genital region. His penis and scrotum were swollen and bruised. The skin of his penis was excoriated and the shape of his penis was distorted, curling off to the side as a result of loss of skin. Due to the severity of the injury, Dr. Lynch called a pediatrician and a urologist to assist.

When asked how her son sustained the injury, she told the physicians that the victim, who was not circumcised, had inserted his thumb into his foreskin and stretched the skin to look more like his two older brothers, who were circumcised. The physicians did not believe that the injuries were self-inflicted and suspected child abuse.

The division for children, youth and families (DCYF) and the Concord Police Department initiated an investigation. Concord Police Officer Julie Curtin and a DCYF caseworker arrived at Concord Hospital and learned that the victim's mother had gone home. Concord Police Detectives Sean Dougherty and John Thomas went to speak with her at her home.

She told the detectives that she had "exclusive sole supervision of the children" and that "no one else in the world" had watched them. When asked about her son's injury, she attributed it to his stretching the foreskin of his penis. She also said that, within the past month, the victim's two older brothers had bitten and kicked the victim's penis. During this conversation, the detectives saw the victim's two older brothers come downstairs and asked the victim's mother if anyone was watching the children. She answered that she had called the defendant early that morning to come watch her children. At the detectives' request, she then took the detectives upstairs to meet the defendant. He introduced himself, stating that he assumed they were there because of the victim's condition. The detectives asked him to spell his name, which he spelled "M-u-z-z-e-y."

The defendant told the detectives that he had seen the victim's injury the night before and that the victim's mother had told him about seeing the victim pulling his own penis the day before.

Several hours after leaving the apartment, the detectives learned that the defendant had misspelled his name and that he had been picked up on outstanding warrants. They went to the Concord police station to interview the defendant. Detectives Dougherty and Thomas conducted the interview while Curtin observed from a separate room on closed circuit television. At the time of the interview, neither Dougherty nor Thomas had seen the victim's injury or spoken with the treating physicians.

According to Dougherty's testimony, the defendant told the detectives that he and the victim's mother had become closer following the death of the boys' father in September 2003 and that he lived at her apartment most of the time. The defendant said that the children had "issues" with toilet training. The detectives told the defendant that the victim's injury could not have been self-inflicted or caused by another child. They urged him to tell them any information he had and told him that there will be consequences for whoever caused the victim's injuries. The defendant began to cry and admitted that he had spanked the children for bedwetting "on five or six occasions." He then asked the detectives, "[W]hat kind of consequences[?]" The detectives explained that the consequences would depend on the seriousness of the injury and the person's involvement. The defendant then stated, "[M]aybe I did do it." While crying, he stated, "I didn't mean to hurt the little guy, I just lost my cool." The defendant then said, "I wanted to tell you guys today when you were at the apartment, but [the victim's mother] was there and I wanted to tell her last night when she discovered it, but I didn't want her to hate me and I didn't want to go to jail."

Dougherty testified that the defendant then gave a detailed confession: On Sunday, January 11, 2004, at around 10:00 a.m., one or more of the boys had wet or soiled their beds and he and the victim's mother had put them in showers. The defendant showered the victim's two older brothers and then took the victim, who had not been in the shower, into the bedroom to put a pull-up diaper on him. The victim began to urinate onto the floor and the defendant. At that point, he "reacted and reached up and he grabbed [the victim] by the penis, spun him around and spanked his bottom and ... he maintained a hold on [the victim's] penis and the scrotum in his hands and ... he pulled him towards the bathroom so that he could finish peeing in the toilet." He held the victim's genitals for ten to fifteen seconds, and his mood at the time was "irate."

Dougherty asked the defendant if he was holding the victim "hard enough to break an egg," and the defendant said "[O]h, yeah." When asked

if it was hard enough to break a walnut, the defendant said he "didn't know about that." Thomas asked him to demonstrate how hard he had squeezed the victim by squeezing Thomas' fingers; he did so and Thomas said, "[T]hat's pretty hard." The defendant stated that the victim had been crying throughout the assault, but stopped when the defendant was dressing him and hugged the defendant, apologizing for urinating. Dougherty testified that the defendant appeared remorseful and apologetic.

Officer Curtin took handwritten notes as she watched the interview from another room. At trial, Curtin reviewed her notes, testifying that she had written down the defendant's statements in chronological order and had "tried to be verbatim." Curtin's notes were consistent with Dougherty's testimony.

Detective Thomas' testimony regarding the defendant's confession corroborated Dougherty's testimony. Thomas also testified that, after the interview, he took the defendant downstairs to book him on assault charges. The defendant asked Thomas if he could call his mother and Thomas permitted the call, taking notes of the defendant's side of the conversation. Thomas testified that the defendant told his mother, "I'm in real trouble, I grabbed one of [the victim's mother's] sons, . . . and I hurt him."

At trial, the victim's mother testified that on the morning of January 11, the victim and his older brothers had soiled their pants. The defendant offered to give the children a shower. The victim's mother then went downstairs. While downstairs, she heard the victim crying. She went upstairs five to ten minutes later and saw the victim wrapped in a towel. The defendant told her that the victim had fallen in the shower. She testified that she first saw the victim's injuries that same day around 8:00 p.m. She showed the injury to the defendant at around 1:00 a.m. and he told her to take the victim to the hospital.

The defendant testified at trial that he had been away from the apartment for several hours on January 10. When the defendant awoke around 10:00 a.m. the next day, he first noticed the victim's injury. The defendant "was considerably shocked" when he saw that the victim's genitals were swollen and red. He testified that when he had bent down on one knee to examine the injury, the victim began to urinate on him. He testified, "I put my right hand up . . . open handed . . . to keep the stream of urine from going up my arm and on the side of my neck." The defendant then yelled at the victim, asking, "[W]hat are you doing[?]" The victim went into the bathroom on his own and finished urinating. The defendant advised the victim's mother to take her son to the hospital.

The defendant also testified that, during the interview at the police station, Thomas told him that "this situation is front page news, and . . . we can keep this out of the papers . . . if you talk to us." He said it was clear that they wanted him to confess. He said that Thomas asked him how hard he would have to squeeze an egg to break it, and that he showed him by squeezing Thomas' fingers. He testified that he "got emotional" and started to cry because he felt like a suspect and was scared. He testified that he told the detectives, "maybe I did hurt [the victim]," because he did not know whether he had hurt him when he put his hand up to stop the victim's urine from hitting him. On cross-examination, the defendant denied saying that he had spun the victim around and spanked his bottom while holding onto his genitals or had walked him to the bathroom while continuing to hold onto them. The defendant said that Curtin, Dougherty and Thomas were "liars."

The three treating doctors testified that the injury could not have been self-inflicted or inflicted by other children. Each doctor testified that the injury could have been caused by a grown man angrily grabbing the victim's penis and scrotum and spinning the child around to spank him and leading the child to another room while holding onto his genitals. Dr. Lynch, the emergency room physician, testified that the victim would not have been able to urinate without significant discomfort.

During closing argument, defense counsel said that the police officers involved in this case "don't like to follow the rules, . . . they want to do things their own way and . . . they think it is okay to bend the rules to get a conviction." Defense counsel told the jury that the reason the detectives did not prepare a written confession for the defendant to sign was that the defendant "wouldn't have signed [it] because it wasn't true." She also argued that detectives were trained in deception and stated, "If you're not a good liar, you're not a good detective . . . . In their mind, deception helps get convictions."

During the State's closing argument, the prosecutor stated to the jury, "Do these people have a motive not to lie? If it is determined that these officers lied and conspired together to convict an innocent man, their careers will be —" Defense counsel objected at this point. The objection was overruled and the prosecutor continued, saying, "their careers will be over."

The sole issue on appeal is whether the prosecutor's argument concerning collateral consequences to the police officers' careers constituted reversible error. The defendant argues that the statement was improper because it concerned facts not in evidence and caused sufficient prejudice to require a new trial. The State makes three arguments in response: (1) the prosecutor's statement was proper in light of cases that

have allowed similar statements; (2) defense counsel's allegation that the three officers had lied to the jury justified the prosecutor's statement; and (3) any error was harmless.

Because the trial court is in the best position to gauge any prejudicial effect that the prosecutor's closing remarks may have had on the jury, we review the trial court's decision for an unsustainable exercise of discretion. *State v. Wood*, 150 N.H. 233, 235 (2003).

The State first argues that the prosecutor's comment was proper in light of existing case law. We have not previously addressed this question. The State forthrightly acknowledges that courts are divided on the issue of whether prosecutors may argue that police officers would risk losing their careers if they were found to be lying. In *State v. Smith*, No. 2003-CA-23, 2004 WL 259246, at *5 (Ohio Ct. App. Feb. 13, 2004), the court upheld the prosecutor's statement that two police officers would not jeopardize their careers by lying about the case. Similarly, in *Lemons v. State*, 608 S.E.2d 15, 22 (Ga. Ct. App. 2004), the court upheld the prosecutor's statement that, "[If] you even for a moment think that the detective would risk his career and —." In both cases, the courts reasoned that the conclusions advocated by the prosecutors could be inferred from the evidence. The court in *Smith* stated that the jury "could reasonably infer that police officers would not jeopardize their careers by lying about a case in which they have no personal interest." *Smith*, 2004 WL 259246, at *5. The court in *Lemons* upheld the prosecutor's comment because it was "the conclusion the prosecutor wished the jury to draw from the evidence, and not a statement of the prosecutor's personal belief as to the veracity of a witness." *Lemons*, 608 S.E.2d at 22 (quotation omitted).

The defendant cites an opposing line of cases. In *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005), the court found improper the prosecutor's statement that his witnesses "are officers that risk losin' their jobs, risk losin' their pension, risk losin' their livelihood . . . [and risk] bein' prosecuted for perjury." Similarly, in *Spain v. State*, 872 A.2d 25, 28 (Md. 2005), the court found improper the prosecutor's statement that "[t]he Officer in this case would have to engage in a lot of lying, in a lot of deception . . . to come in here and tell you that what happened was not true. He would have to risk everything he has worked for."

These courts have identified a number of reasons for ruling that prosecutors engage in improper argument when they argue that police officers risk their careers by lying to the jury. *See Weatherspoon*, 410 F.3d at 1146-51; *Spain*, 872 A.2d at 30-32. The *Weatherspoon* court found that such arguments "vouch for the credibility of witnesses and . . . encourage the jury to act based on considerations other than the particularized facts

of the case [and] pose a real danger to the defendant's right to a fair trial." *Weatherspoon*, 410 F.3d at 1152. In addition, they "clearly [urge] that the existence of legal and professional repercussions served to ensure the credibility of the officers' testimony," *id.* at 1146, and "[place] the prestige of the government behind a witness [by providing] personal assurances of the witness's veracity," *id.* (quotation omitted). The court in *Spain* found that such arguments impermissibly elevate the credibility of police officers over the credibility of other witnesses, including the defendant. *Spain*, 872 A.2d at 32.

We are more persuaded by the cases cited by the defendant than by those cited by the State because the former more accurately assess the impact of such statements on the jury. Furthermore, they are consistent with our previous cases holding prosecutors to a high standard by not allowing them to vouch for the credibility of witnesses by citing facts not in evidence. *See, e.g., State v. Boetti*, 142 N.H. 255, 261 (1997); *State v. Bujnowski*, 130 N.H. 1, 4-5 (1987); *State v. Bureau*, 134 N.H. 220, 224 (1991).

■ In this case, the prosecutor's statement effectively told the jury that if it returned a verdict of not guilty, the police officers would suffer detrimental consequences to their careers. There was no testimony regarding the likelihood of such consequences. Thus, the prosecutor's statement required the jury to speculate about these consequences and distracted it from its primary responsibility of weighing the evidence before it. Moreover, the prosecutor's statement was a personal assurance of the credibility of the officers. The prosecutor appeared before the jury as an agent of the government and his statement about the officers' credibility effectively placed the government's prestige behind the officers. *See Weatherspoon*, 410 F.3d at 1146. His statement directly contravened our prior warning that "[t]he representative of the government approaches the jury with the inevitable asset of tremendous credibility—but that personal credibility is one weapon that must not be used." *Bujnowski*, 130 N.H. at 4-5 (quotation omitted). Finally, upholding the prosecutor's argument as proper in this case would open the door to similar arguments in future cases. This would create uncertainty in the law by blurring the line differentiating proper argument from impermissible speculation.

The State next argues that the prosecutor's argument was invited by defense counsel's allegations that the officers were lying. To support this position, the State relies on *Bureau*, 134 N.H. at 224, where we upheld a prosecutor's argument that a witness had no reason to lie in response to statements by defense counsel that had "continually attacked the [witness's] credibility." Similarly, in *State v. Brinkman*, 136 N.H. 716, 719-

21 (1993), we found no impropriety in an argument that a witness had nothing to gain by testifying falsely where defense counsel had attacked the witness's credibility. However, unlike the arguments in *Bureau* and *Brinkman*, the argument here went beyond merely stating that the witnesses had no motivation to lie and added that they would suffer negative consequences to their careers if they were found to be lying.

The State also relies upon two cases where courts found that defense counsel's allegations that police officers were lying invited prosecutors to argue that the officers risked their careers if they were found to be lying. First, in *State v. Carr*, 374 A.2d 1107, 1114 (Conn. 1977), defense counsel "had intimated that the officer's testimony was motivated by his desire for promotion." The prosecutor then argued that if the jury did not believe the police officer, it would be deciding that he was a liar and would ruin the police officer's reputation. *Id.* The court stated, "We are not convinced that the [prosecutor's] comments were not provoked or that they were flagrantly improper." *Id.* (quotation omitted). Unlike in *Carr*, defense counsel in this case did not argue that the officers' testimony was motivated by desire for a promotion.

The State also relies on *State v. Walker*, No. 2004AP2747-CR, 2005 WL 2086208, at *2 (Wis. Ct. App. Aug. 31, 2005), *review denied*, 708 N.W.2d 694 (Wis. 2005) (Table). There, the prosecutor stated that the detective risked losing her job if she testified falsely. *Id.* Defense counsel had argued that the detective was lying, but had never argued that her career depended on testifying falsely. *Id.* Nonetheless, the court held that "[t]he prosecutor's rebuttal argument was a measured response to [the defendant's] suggestion that [the officer] was lying." *Id.*

■ We disagree that defense counsel's mere allegation that an officer is lying invites the prosecutor to suggest that the officer would risk his career if he were found to be lying. *See United States v. Swiatek*, 819 F.2d 721, 731 (7th Cir. 1987), *cert. denied*, 484 U.S. 903 (1987). Here, while the defendant's allegations that the police officers were lying may have justified the prosecutor's argument that the officers had no motive to lie, it did not invite the prosecutor to argue that police officers risked losing their careers if they were found to be lying. The prosecutor's statement went beyond merely countering allegations that the officers were lying by encouraging the jury to speculate on the effect the verdict might have on their careers.

■ We next address whether the failure to sustain the defendant's objection constituted reversible error. "An improper comment made by the State during closing argument may, under certain circumstances, constitute prosecutorial overreaching requiring a new trial." *State v.*

*Scognamiglio*, 150 N.H. 534, 537 (2004) (quotation omitted). "In examining claims of prosecutorial misconduct during closing argument, we face the delicate task of balancing a prosecutor's broad license to fashion argument with the need to ensure that a defendant's rights are not compromised in the process." *Id.* (quotation omitted). If the prosecutor's remark was impermissible, we must determine whether the error requires reversal of the verdict. *State v. Ellsworth*, 151 N.H. 152, 155 (2004). In doing so, we balance the following factors: (1) whether the prosecutor's misconduct was deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether any prejudice surviving the court's instruction likely could have affected the outcome of the case. *Id.*

The first factor is whether the prosecutor's misconduct was deliberate. *Cf. Ellsworth*, 151 N.H. at 157. In *Ellsworth*, we found that the prosecutor's statement to the jury, which indicated that the "defendant was the only person who could explain how he assaulted the victim," was deliberate because "the prosecutor did not admit to making a mistake or express any regret" after making the comment. *Id.* We concluded that "the prosecutor's impermissible comment about the defendant's failure to testify was a conscious decision, as opposed to a mere slip of the tongue." *Id.*

At the time the prosecutor in *Ellsworth* made his statement, the law clearly prohibited prosecutors from commenting on the defendant's choice not to testify at trial. *See Griffin v. California*, 380 U.S. 609, 615 (1965). However, unlike *Ellsworth*, at the time the prosecutor made his closing argument in this case, New Hampshire law did not clearly prohibit prosecutors from arguing that officers risked losing their careers if they were found to be lying. The prosecutor here was not on notice that his statement was prohibited. *Cf. United States v. Cox*, 752 F.2d 741, 745 (1st Cir. 1985) (prosecutor's comment regarding the defendants' failure to testify at trial was deliberate in light of his "prefatory statement pointing out to the jury that defendants need not present any defense suggests that he saw relevant danger lurking in the questions that followed"). Thus, we do not find that the prosecutor's misconduct in this case was deliberate.

The second factor in our analysis is whether the jury instructions adequately cured the prosecutor's improper statement. *Cf. Ellsworth*, 151 N.H. at 157. We have recognized that an immediate curative instruction can remedy improper prosecutorial commentary. *See id.* "[A] trial court's immediate curative instruction bears the weight of judicial disapproval." *Id.* Here, the trial court did not give an immediate curative instruction, but issued only a general jury instruction prior to the closing argument. The instruction listed a number of credibility factors and instructed the jury to

"consider these factors in deciding the credibility of all of the witnesses whether or not they happen to be ordinary citizens or police officers." The court also instructed the jury, "[Y]ou will hear the lawyers discuss the facts and the law in their [closing] arguments to you. These argument are not evidence." However, neither this language nor any other language within the trial court's instruction signaled to the jury that the court disapproved of the prosecutor's statement. *Cf. id.* We thus find that this instruction was not sufficiently strong or explicit to outweigh the danger of the prosecutor's improper statement. *Cf. id.*

The third factor is whether any prejudice surviving the court's instruction likely affected the outcome of the case. *See id.* The evidence supporting the defendant's conviction was overwhelming. The defendant confessed to injuring the victim in detailed and graphic terms. The confession was recorded in the officers' notes and each officer gave nearly identical testimony as to what the defendant said during his confession. Moreover, the defendant's confession was strongly corroborated by the medical evidence and testimony of the treating doctors, who testified that the victim's injuries could have been caused by the actions to which the defendant confessed. The officers, who had no medical training and had not spoken to the doctors about the injuries prior to obtaining the defendant's confession, could not have invented a story that fit the medical facts so well. The confession's legitimacy was bolstered by the defendant's admission that much of the officers' account of what he told them was true. Moreover, the defendant testified to a series of events that was entirely devoid of credibility. On these facts, we can comfortably say that any prejudice the prosecutor's statement may have caused was minimal. Weighing this factor in light of factors one and two, we are convinced that the comment did not affect the outcome of the case.

We therefore find no reversible error. The defendant's other arguments on appeal are without merit and warrant no further discussion. *Cf. Vogel v. Vogel,* 137 N.H. 321, 322 (1993).

*Affirmed.*

BRODERICK, C.J., and DALIANIS and GALWAY, JJ., concurred.